CHAPMAN & DEWEY LUMBER COMPANY *v.* BRYAN.

Opinion delivered February 9, 1931.

*Joe C. Barrett* and *Dudley & Dudley,* for appellant.
*Harrison, Smith & Taylor* and *C. T. Carpenter,* for appellee.

SMITH, J. Appellant, a Missouri corporation, operates a large sawmill at Marked Tree in this State. Appellee, while employed at the mill, sustained a personal

injury, and this suit was brought to recover damages to compensate his injury. The sawmill is located in Poinsett County, but the suit was brought in Crittenden County. Appellant is not engaged in business in the latter county, and was not in business there when this suit was brought.

An answer was filed May 31, 1927, in which the negligence of the defendant company was denied, and the defenses of assumption of risk and contributory negligence were set up. The opinion of this court had been handed down (November 2, 1925) in the case of *Power Manufacturing Co.* v. *Saunders,* 169 Ark. 748, 276 S. W. 599, at the time the answer was filed, but the appeal therefrom to the Supreme Court of the United States had not then been decided. In this Power Manufacturing Company case we construed § 1829, C. & M. Digest, which provides that service of summons upon a foreign corporation doing business in this State "shall be sufficient service to give jurisdiction over such corporation to any of the courts of this State, whether the service was had upon said agent within the county where the suit is brought or is pending or not." We upheld the statute on the theory that venue is a question of procedure, which the State may determine, and the authority existed under this statute, as we construed it, to prosecute the present action in the circuit court of Crittenden County, where the suit was brought, although the defendant corporation was not engaged in business in that county.

But, on May 31, 1927, which was the very day the answer had been filed in this case, the Supreme Court of the United States reversed the decision of this court (*Power Manufacturing Co.* v. *Saunders,* 274 U. S. 490, 47 S. Ct. 678), holding that the statute was unreasonable and arbitrary and in violation of the equal protection clause of the 14th Amendment to the Constitution of the United States, as applied to foreign corporations doing business in the State.

Thereafter, on November 25, 1927, which was the first day of the following term of the Crittenden Circuit

Court, the appellant company filed a motion, in which it asked permission to withdraw the answer previously filed and to dismiss the cause for want of jurisdiction. This motion was heard and denied and an exception was duly saved. It appears, however, that the appellant had not, prior to filing this motion, questioned the jurisdiction of the Crittenden Circuit Court, and the answer was a general appearance denying liability, without questioning the jurisdiction of the Crittenden Circuit Court.

It is not now questioned that the appearance of the appellant company might have been entered, although the court was without jurisdiction, nor is it questioned that such appearance was entered. The insistence is that the appearance was entered only because, under the law as this court had declared it, the Crittenden Circuit Court had jurisdiction of the cause of action, and that holding had not been reversed by the Supreme Court of the United States at the time the answer was filed. But the appellant company had the same right, notwithstanding our decision, to question the jurisdiction that the Power Manufacturing Company had, yet it did not do so.

It is familiar law that one may submit to a jurisdiction which could not otherwise be acquired, and that one does submit who, without questioning the jurisdiction, enters an appearance, and it has been many times decided by this court that any action on the part of the defendant, except to object to the jurisdiction, which recognizes the case as in court, will amount to a general appearance, and an appearance cannot be more completely entered than by filing an answer, and this, as we have said, the appellant company did without raising any question as to the jurisdiction of the court. This rule was announced in the early case of *Murphy* v. *Williams,* 1 Ark. 376, and has since been followed; indeed, the rule appears to be universal. *Foohs* v. *Bilby,* 95 Ark. 302, 129 S. W. 1104; *Harris* v. *Smith,* 133 Ark. 250, 202 S. W. 244; *Sager* v. *Jung & Sons Co.,* 143 Ark. 506, 220 S. W. 801; *Payne* v. *Stockton,* 147 Ark. 598, 229 S. W. 44; *J. C.*

*Engleman, Inc.,* v. *Briscoe,* 172 Ark. 1088, 291 S. W. 795; *Fidelity Mut. Life Ins. Co.* v. *Price,* 180 Ark. 214, 20 S. W. (2d) 874.

Appellee lost one finger and sustained an injury to another, and recovered a judgment, which is not complained of as being excessive, and this appeal has been prosecuted to reverse that judgment. It is insisted, for the reversal of this judgment, that the testimony is not legally sufficient to sustain it, and that error was committed in giving certain instructions.

The testimony tending to sustain the verdict may be briefly summarized as follows: Appellant company operates a mill at Marked Tree, where logs are first sawed into boards, which are then run through a trimmer and there trimmed into standard lengths. The trimmer is 16 feet in length, and has 6 saws, mounted in an east and west line. The first saw is at the east end, and the remaining five saws are mounted in a straight line 8, 10, 12, 14 and 16 feet, respectively, west of the first, and, according to their distance from the first saw, are called the 8-foot saw, the 10-foot saw, and so on. Each of these saws is mounted on a separate mandrel, has a separate pulley, and is driven by a separate belt, but all of the six saws are driven by the same power shaft, called the line shaft. The line shaft is eight feet south of the saws, and each belt extends back around the common line shaft. These saws are in the north end of a table, and there are slits in the table through which these saws are raised and the appropriate one used to trim the boards into the length desired. The trimmer saws are operated by an employee called the trimmer sawyer, or trimmer, who occupies an elevated position just south of the trimmer table, from which he can observe the boards as they move across the table towards the saws and determine just what part of each board shall be cut off. If the board will make one 14 feet long he pulls the lever of the 14-foot saw, and so, likewise, with the appropriate saws to make other lengths. This work requires experience and judgment, and the

trimmer had authority over the other employees assisting him, of whom appellee was one.

A deep trough runs east and west along the north edge of the trimmer table and by the trimmer saws. The sawdust from the trimmer and the ends of boards cut by it fall into this trough and are carried off by an endless chain which runs in it. This trough is about six feet deep, that is, about six feet below the level of the saws.

Appellee's general duty was to "load the trimmer," that is, to keep on hand a supply of boards to be trimmed. The belt which operated the 14-foot saw came off, and appellee was ordered by the trimmer sawyer to replace it. He had previously been given the general instruction to obey the orders of the trimmer sawyer. This belt which appellee was ordered to replace was not only old and worn, but, where its ends met, a piece had been torn off, and, instead of replacing it with a piece of belting, this place had been laced over and the ends of the thongs of the lacing used in splicing the belt hung loose. This fact was unknown to appellee, and could have been discovered only by inspection, and would have been unobservable while the belt was in motion. There was some question whether appellee had, himself assisted in lacing this belt, but he denied having done so, although he admitted having assisted in lacing another belt, but it was not shown that unused ends of thongs were allowed to remain on the belt which appellee had assisted in lacing. When appellee was ordered to replace the belt which had come off, it was necessary for him to get down into the trough which has been described, and, while in it, to brace himself against the sides thereof as best he could, as no other means had been provided for reaching the belts. Another witness, an expert sawyer and millwright, describing the position which appellee assumed to obey the trimmer's order to replace the belt, said, "That is the awkwardest position I was ever in."

It was a rule of the company not to stop the trimmers to replace a belt, so that all the other saws were in

motion while appellee was replacing the belt for the 14-foot saw. In the execution of the trimmer's orders, appellee left his table, where he was loading the trimmer, got into the trough, and seized the belt and pulled it forward to the pulley, and, as he pulled the belt around, it started to move on the pulley. As soon as contact was made between belt and pulley, the saw and the belt began to revolve, but, in order to get the belt properly on the pulley, it was necessary for appellee to push against the belt until it had slipped to its proper position on the pulley. The belt and pulley were each eight inches wide, and, of course, occupied that much of the space between the 14-foot and the 16-foot saws, and, as these saws were only two feet apart, there was a clear space of only 16 inches. Appellee testified that when the belt started, his fingers were caught in the ends of the thongs when that portion of the belt came around, and that his hand was jerked against the 16-foot saw, which produced the injury complained of.

We think the facts thus summarized made a case for the jury, and the questions of the master's negligence, on the one hand, and those of assumption of risk and contributory negligence, on the other, were submitted to the jury in numerous instructions given at the request of the respective parties and on the court's own motion. These instructions conformed to the law as it has been declared in many cases by this court, and no useful purpose would be served by reviewing them.

Appellee's testimony was to the effect that he did not know the defective condition of the belt, and therefore did not know and appreciate the danger of attempting to restore it to its place, and the jury was warranted in finding that the appellee was injured while obeying the order of his superior, and that the danger was not so patent that appellee, in the exercise of ordinary care for his own protection, in the performance of his duties in the usual and ordinary manner, would necessarily have discovered the defects and have known and appreciated the danger arising therefrom.

There appears to be no error in the record, and the judgment must be affirmed, and it is so ordered.