Arch PENDER III, Arch PENDER, Jr., Maxine
PENDER and Brenda PENDER *v.* Eugene
McKEE and Dorothy McKEE

78-127                                    582 S.W. 2d 929

Opinion delivered June 18, 1979
(In Banc)

*DeLoss McKnight* and *Giles Dearing,* for appellants.

*B. Michael Easley* of *Kinney & Easley,* for appellees.

JOHN A. FOGLEMAN, Justice. This appeal was taken by the father and paternal grandparents of Belinda Jean Pender from a decree of adoption entered March 6, 1978, in the Probate Court of St. Francis County for her adoption by appellees Eugene McKee and Dorothy McKee. The McKees have resided in St. Francis County for approximately 15 years. The child was born on October 16, 1975, to Arch Arthur Pender III, then 21 years of age and Brenda Kay Wyers Pender, then 19 years of age. Both the parents and all the grandparents of Belinda were then residents of Cross County. These parents were separated at the time of Belin-

da's birth, or shortly thereafter. Belinda was born prematurely and survived only with considerable difficulty. She was born in the Cross County Hospital at Wynne and kept there in an incubator about 30 days. For three days after her mother and paternal grandmother took her from the hospital, the child was having trouble breathing and suffering seizures, so they took her to a physician, and, upon his recommendation, took her to a hospital, where she remained for some time. By agreement with the parents, the child, then three months old, was taken from the hospital by Arkansas Social Services and immediately placed in the home of appellees, on December 15, 1975, where she was kept for six to ten months.

Arkansas Social Services took Belinda from the McKees and returned her to her parents. In December, 1976, the parents were separated and Belinda's mother Brenda, who is also an appellant, brought her, along with her two brothers, one older and one younger than she, to the home of Mr. and Mrs. Arch Pender, Jr., her paternal grandparents, where they remained until May, 1977. Arkansas Social Services filed a petition in the Juvenile Court of Cross County, alleging that neither the maternal grandmother's home nor the paternal grandparents' home was a suitable place in which to raise these children. As a result, the juvenile court ordered the children removed from the Pender home and put in the custody and under the control of Arkansas Social Services, where they remained for about four months. The juvenile court specifically found that the home of the paternal grandparents was crowded, unclean and unsanitary, and that the parents had separated on several occasions.

A petiton was later filed by the paternal grandparents for a return of the children to their custody. On September 27, 1977, the juvenile court granted this petition, subject to continued supervision, or "protective surveillance," by Arkansas Social Services. Belinda remained with her paternal grandparents until removed by order of the Chancery and Probate Court of St. Francis County, entered March 30, 1978, in this proceeding, which had been commenced by the petition of the McKees for adoption of Belinda, filed December 28, 1977. This order was entered after the chancellor and probate judge had consolidated the adoption

proceeding and a petition for habeas corpus filed by appellees in the Chancery Court of St. Francis County to obtain custody of Belinda after the order of adoption was granted.

Appellants argue that the order of adoption was granted without the consent required by statute. Neither the parents, nor the paternal grandparents, gave their consent. The probate court held that their consent was not necessary.

We have concluded that the consent of the Juvenile Court of Cross County was not necessary. The adoption proceedings were governed by the Revised Uniform Adoption Act [Ark. Stat. Ann. § 56-201 et seq (Supp. 1977)]. Consent of the juvenile court would have been necessary only if there was no person lawfully entitled to custody of Belinda *or* empowered to consent to her adoption. Ark. Stat. Ann. § 56-207 (a) (3) and (4). The paternal grandparents were lawfully entitled to custody of the child. The requirements of Ark. Stat. Ann. § 56-206 (a) (3) are alternatives. The use of the disjunctive "or" makes the legislative intent quite clear that consent can be given either by (1) any person lawfully entitled to custody of the minor or (2) any person lawfully empowered to consent to her adoption. That person clearly need not be both lawfully entitled to custody and lawfully empowered to consent. The purpose of the legislature to authorize one who has been empowered to consent to do so, without also being lawfully entitled to custody, is clear. Thus, it is clear that the paternal grandparents had the power to consent to this adoption, because they were lawfully entitled to her custody, so Ark. Stat. Ann. § 56-206 (a) (4) never came into play.

Appellants did not assert any point for reversal upon the failure of the juvenile court to consent to the adoption and they did not contend in the original hearing in the adoption proceding that it was necessary. In their brief, they did advance subsidiary arguments that the juvenile court order relied upon by the probate court was void because it was entered without notice to either the parents or the grandparents, and that the juvenile court was without power to consent to an adoption. The probate court did not base its order of adoption solely on the consent of the juvenile court.

Its holding based upon that consent was more properly a "makeweight" or secondary reason for holding that the consent of the natural parents was unnecessary. The court's order had, before reciting this holding, stated that the natural mother had abandoned the child, that the natural father had, within the meaning of Ark. Stat. Ann. § 56-207 (a) (1), effectively abandoned Belinda and, within § 56-207 (a) (2), "for a period of at least one year has failed significantly without justifiable cause . . . to provide for the care and support of the child as required by law or judicial decree," and that the consent of the grandparents was not necessary because the juvenile court did not give them that power and the grandparents were unreasonably withholding their consent. Thus, we need only consider appellants' points for reversal, i.e.:

# I

## THE COURT ERRED IN GRANTING THE ADOPTION WITHOUT THE CONSENT OF THE FATHER.

# II

## THE COURT ERRED IN GRANTING THE ADOPTION WITHOUT THE CONSENT OF THE PATERNAL GRANDPARENTS WHO HAD CUSTODY OF BELINDA PENDER AND WHO WERE LAWFULLY ENTITLED TO CUSTODY.

# III

## THE COURT ERRED IN REFUSING THE MOTHER'S MOTION TO SET ASIDE THE ORDER OF ADOPTION FOR LACK OF JURISDICTION.

# IV

## THE COURT ERRED IN ITS FINDING THAT IT WOULD BE IN THE BEST INTEREST OF THE CHILD THAT THE PETITION FOR ADOPTION BE GRANTED.

I

The holding of the probate judge that Arch Pender III had abandoned Belinda is clearly against the preponderance of the evidence. Abandonment, in the sense of the adoption statutes, means conduct which evinces a settled purpose to forego all parental duties. *Woodson* v. *Lee,* 221 Ark. 517, 254 S.W. 2d 326. Permitting his child to remain for a time undisturbed in the care of others does not constitute such an abandonment. *Woodson* v. *Lee,* supra; *Walthall* v. *Hime,* 236 Ark. 689, 368 S.W. 2d 77. In *Walthall,* we followed this dictionary definition of abandonment:

> To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connections with or concern in; to desert, as a person to whom one is bound by a special relation of allegiance or fidelity; to quit; to forsake.

While Belinda was with the McKees, her father did visit her and came, on occasion, to pick her up. There was testimony that he was, at the time of the trial, visiting his children at his parents' home every day and buying food and milk for Belinda. Arch Pender III testified that when he was in Missouri, where he normally makes his home, he usually came down and visited Belinda every other weekend. He said that, when he was employed in Missouri, he had sent what money he could, after he paid his bills, to his father for Belinda's support. He said that he paid a total of $615 for child support in 1976 in three equal installments, even though he admitted that Brenda had denied receipt of them. The recited testimony is otherwise uncontradicted, so we cannot say that appellees met their burden of proving by clear and convincing evidence that Arch Pender III had abandoned Belinda within the meaning of the adoption statutes.

We are not at all certain about the terms of any judicial decree requiring Arch Pender III to support this child, and the record, as abstracted, does not disclose the identity of the court in which such a decree was entered, but he seems to have conceded that he was required, by a Missouri court, at

one time to pay $205 per month to his wife, Brenda Pender, who has not had custody of Belinda for any significant period of time. It seems that these payments were required for the three children. It also appears that, on January 9, 1978, after the petition for adoption was filed, he made one payment of $25 upon an order for weekly payments in that amount obtained or issued by a Child Support Enforcement Unit. This also appears to have been for all three children. It is admitted that he was two weeks in arrears on those payments at the time of the trial.

We cannot say, however, that the probate judge erred in holding that Arch Pender III had failed significantly, without justifiable cause, to support Belinda, as required by law, even when the evidence is tested on the "clear and convincing standard," now effective in such cases. *Harper* v. *Caskin*, 265 Ark. 558, 580 S.W. 2d 176 (1979).

The law requiring a father to support his minor child has been declared by statute. Ark. Stat. Ann. § 67-633 a (Repl. 1971). It is also his legal obligation, independent of statute. *Brown* v. *Brown*, 233 Ark. 422, 345 S.W. 2d 27; *McCall* v. *McCall*, 205 Ark. 1123, 172 S.W. 2d 677.

The question was whether the father has "failed significantly" for a period of one year to support his child "without justifiable cause." "Failed significantly" certainly does not mean "failed totally." It only means that the failure to support must be significant, as contrasted with an insignificant failure. It denotes a failure that is meaningful or important. Webster's New International Dictionary, 2d Ed.

Appellants admit that while the McKees had Belinda, her father contributed nothing to her support. Although the chancellor found that this period was approximately six months, it seems to us that the evidence shows that it was at least ten months. The child was taken from the McKees and placed in her mother's custody about November 1, 1976, but, according to Arch Pender, Jr., she took all three of her children and "dumped them out" at the home of the paternal grandparents in December, 1976. The father stated that while he was working at a full-time job in Kennett, Missouri,

he sent four or five payments of child support as ordered by the court, but Brenda and "all of them" told him they didn't get the money. He had worked at a cotton gin from October 14 to December 7, 1977. He was paid at the rate of $2.60 per hour. He had been regularly and steadily employed prior to that time on a farm by the same employer. It appears from the testimony of Arch Pender III that he sent whatever support payments he claimed to have made during 1976 to Brenda, and he admitted that neither Brenda nor anyone else acknowledged receipt of these payments. Jackie Peeler, a Social Service Specialist with the Cross County Social Service, to whom the Pender case has been referred for protective surveillance, testified that, assuming that Arch Pender III had made three payments of $205 each, she would not consider that they constituted a substantial amount to pay for the support of his three children for one year.

Thus, the record shows clearly that Arch Pender III made no substantial contribution to Belinda's support between December 15, 1975, when she was taken to the McKees, and the time she was "dumped" at his parents' home. The substantiality of his contribution thereafter is questionable to say the least. The testimony indicates that his payments to his parents, when made, have been $20 or $25 per month. Even his father would not say that he supported his children. Arch Pender, Jr., would only say that he helped.

Appellants also admit that Arch Pender III contributed nothing to the support of the children for a period of at least 4-1/2 months between the date in May, 1977, when the children were placed in the custody of Arkansas Social Services by order of the Juvenile Court of Cross County, and September 27, 1977, when that court vested custody in the paternal grandparents. The test of the statute was met, if Belinda's father failed, in a meaningful or important respect, to support her, without justifiable cause, for any consecutive period constituting a total of one year between October 16, 1975 when she was born and December 28, 1977, when the petition for adoption was filed. The one year period specified by statute need not be the year immediately preceding the judgment of adoption, since "a period of at least one [1] year" in the statute means any one year period. *Lout* v.

*Whitehead,* 415 S.W. 2d 403 (Tex., 1967); *Garcia v. Canales,* 434 S.W. 2d 895 (Tex. Civ. App., 1968); *Homfeld v. Pence,* 487 S.W. 2d 224 (Tex. Civ. App., 1972); *Curton v. Gordon,* 510 S.W. 2d 682 (Tex. Civ. App., 1974). In this connection, it is significant that prior statutes [Ark. Stat. Ann. § 56-106 (b) (I) (Repl. 1971)] on abandonment required that the requisite period be "next preceding the filing of the petition," as do statutes involved in cases holding to the contrary. No such language appears in Ark. Stat. Ann. § 56-207. The trial court's findings were that Arch Pender III spends a great part of the year in Missouri, that, when he was in Missouri, his contributions to the care and support of the child were negligible, that his care and support during the time he was in Arkansas were also negligible and that the evidence *conclusively* showed that what little care and maintenance the child receives is provided by welfare payments.

Whatever appellant may have contributed since he returned to Arkansas from Missouri in December, 1977, does not constitute redemption from his failure which had already extended over a priod of more than one year. After the required period of one year has passed, resumption of payment of support for a brief period, particularly after the commencement of the adoption proceeding or just prior thereto, is not sufficient to bar an adoption without the consent of the delinquent father by starting a new one year period of non-support under the statute. *Lout v. Whitehead,* supra; *Homfeld v. Pence,* supra; *Jones v. Bailey,* 284 S.W. 2d 787 (Tex. Civ. App., 1955). In any event, delinquency in support is not an ambulatory thing which can be recalled, cancelled out or nullified merely by a change of the father's mind or desire. *DeGolyer v. Chesney,* 527 P. 2d 844 (Okla., 1974).

Since the evidence clearly shows that Belinda's father has "failed significantly" to support her, the question of his justifiable cause remains. The evidence of justifiable cause is even less substantial than his contributions to Belinda's support. The asserted justifiable cause is that no one asked him to pay anything or to provide anything until the child was returned to her mother, and that he then paid her four or five payments of $205 through the court at Kennett, Missouri. He claims that Arkansas Social Services never asked him to pay

anything for Belinda's support, either during the period the child was with the McKees, or the period between May and September, 1977. He argues that the Juvenile Court of Cross County could have ordered him to make payments under Ark. Stat. Ann. § 45-431 (Repl. 1977) but did not do so. He also seeks to justify his failure on the assertion that, when the child is not in his custody, he is not necessarily responsible for all its support. The fact that someone else had custody of the child did not relieve Arch Pender III of his obligation to support her. See *Barnhard* v. *Barnhard*, 252 Ark. 167, 477 S.W. 2d 845. The parent must furnish the support and maintenance himself and the duty is a personal one, and he may not rely upon assurance that someone else is properly supporting and maintaining the child to avoid the impact of the statute's providing for adoption of his child without his consent because of his failure to support the child. *In re Adoption of Sargent*, 28 Ohio Misc. 261, 272 N.E. 2d 206 (1970). The father's duty to support his minor child cannot be excused on the basis of the conduct of others, unless that conduct prevents him from performing his duty. *Kirby* v. *Kirby*, 184 Ark. 532, 42 S.W. 2d 995. See *Aaron* v. *Aaron*, 228 Ark. 27, 305 S.W. 2d 550; *Jones* v. *Jones*, 199 Ark. 1000, 137 S.W. 2d 238; *Green* v. *Green*, 232 Ark. 868, 341 S.W. 2d 41. See also, *Moreau* v. *Buchholz*, 124 Colo. 302, 236 P. 2d 540 (1951). A parent's suffering a child to be supported as a pauper by welfare agencies when he has the ability to support it has been held to afford a proper basis for making his consent to adoption unnecessary. *Purinton* v. *Jamrock*, 195 Mass. 187, 80 N.E. 802 (1907).

This irresponsible attitude of this father clearly indicates that he had no justifiable cause for his failure. Most of the contributions he claims to have made appear to have been attributable to some form of compulsion or to the pendency of this proceeding. The natural father has the duty and obligation to support his minor child whether ordered to do so by a court or not. *Laslie* v. *Cole*, 465 S.W. 2d 811 (Tex. Civ. App., 1971); *Homfeld* v. *Pence*, supra; *Curton* v. *Gordon*, supra.

The probate judge correctly held that the consent of this father was not required.

## III

The mother's position is different. She now contends that the probate court was without jurisdiction, and the order of adoption denied her due process of law, because she was never served with notice of the proceeding. This was a belated plea, raised by her motion to vacate the order after it was entered. Unquestionably, natural parents are entitled to notice of the proceeding and an opportunity to resist the action. *Hughes* v. *Cain,* 210 Ark. 476, 196 S.W. 2d 758.

Notice of the hearing was issued. The return of Deputy Sheriff Robert Futrell shows that it was served on Brenda Pender on December 30, 1977. The response to the petition was filed on January 18, 1978, on behalf of Arch Pender, Jr., and Maxine Pender, paternal grandparents of Belinda Pender and Arch Pender III and Brenda Pender, parents of Belinda Pender, by DeLoss McKnight, who still represents the father and paternal grandparents on this appeal.

In her motion to vacate the order, Brenda alleged, not only that she had not been served with any summons or notice, but that she had not entered her appearance or authorized anyone to do so. After hearing the testimony of Brenda Pender, Robert Futrell, Jerry Jackson and Virginia Owens, the probate judge made the following findings:

1. That from the testimony of Brenda Pender it appears that she voluntarily entered her appearance and did in fact have knowledge of these proceedings. The Court is of the opinion that Mr. McKnight, having filed an Answer on her behalf, she is in Court, and subject to the findings hereof.

2. The Court finds that Brenda Pender does not consent to the adoption but is bound by its issuance and the Motion to Vacate is denied.

These findings are supported by a clear preponderance of the evidence. Brenda Pender carried the burden of overcoming the officer's return and of showing that she had no notice of the proceeding. *Rose* v. *Ford,* 2 Ark. 26; *Broadway* v.

*Sidway*, 84 Ark. 527, 107 S.W. 163; *Nix* v. *Dunavent*, 249 Ark. 641, 460 S.W. 2d 762. See also, *Williams* v. *Edmondson*, 257 Ark. 837, 520 S.W. 2d 260; *Massachusetts Benefit Life Ass'n.* v. *Lohmiller*, 74 F. 23 (7 Cir., 1896). She testified that she had been living in Parkin for about four years; that she had seen no papers telling her about the hearing in the cause for adoption; that she was in the hospital at West Memphis when the papers were supposed to have been served; and that no one served any papers on her or told her to come to court. Her credibility was certainly suspect. She admitted that she had heard of the hearing but didn't come to court because she didn't get any papers. On cross-examination, she admitted that it was her grandmother, not she, who had been in the hospital, that she had come back to Parkin on December 29 and had gone to the police station, that she had known Jerry Jackson, Chief of Police in Parkin, all her life, and that he "hollered at me something about being in Court, but I didn't hear him." She did remember his telling her to be in court on the adoption matter.

On examination by the probate judge, Brenda said that on one occasion she had talked with her husband about the effort of the McKees to adopt Belinda and that they reached a decision that the McKees were not going to get her. She said that she knew that her husband and his father were going to see McKnight and admitted she told them to do whatever they wanted to do about it. She admitted that she told her husband to "sort of act" for her and that when McKnight put her name on the pleading, he really had her authority to do so. She also admitted that she knew about the hearing and that her father-in-law had come to her and told her the date the hearing would be held.

She said that she had not employed McKnight, but during examination by her attorney, the following question was propounded and answer given with reference to her previous answer that she had not been in McKnight's office:

Q. Did you go by yourself, or with your husband when you went there?

A. I never did go. I never did go to sign any adoption

papers, but I went there once before, went with my father-in-law. I never did talk to Mr. McKnight.

More importantly, on recross-examination by appellees' attorney, Brenda admitted that she had known that McKnight had filed an answer in her behalf. This recross-examination also included this question and rather strange answer:

Q. You knew Mr. Jackson told you to be in Forrest City concerning this adoption on a certain day when you were at the police station?

A. Yes, but I did not hear him.

Robert Futrell testified that he had appointed Jackson to serve the notice. Jackson testified that Brenda had come to the police station on December 30, 1977, to pick up some pills and that he advised her of the proceeding and told her to be in court, but did not give her the notice. He recalled telling her the time, place and nature of the proceedings. The notice was given to Jackson by Futrell. Futrell authorized Jackson to serve the notice, and was the only one who gave Jackson instructions about the service. Jackson did not give her the papers, but left them in a tray on his desk and ran outside the building to tell her about them. He made no return on the notice.

The probate judge held that Brenda had actual notice of the hearing, that the other Penders went to McKnight's office and told this attorney that she joined them in resisting the adoption and that he filed a pleading listing all of them as respondent. The judge found that Brenda had told her husband and his parents to go ahead and do whatever they wanted to, because she also objected to the adoption. McKnight did not testify, but stated, and offered to testify, that Brenda had not authorized him to file the response, but that he had asked Arch Pender, Jr., if she wanted him to represent her and Pender said that she did. McKnight said that he asked Pender to have her come to his office, but that she never came.

After the probate court denied the motion to vacate the order of adoption on the basis of the lack of service of notice, Brenda was permitted to testify further. She then stated that the only time she had discussed adoption with anyone was the time of a juvenile court hearing when she discussed it with the paternal grandparents. She expressed no desire to have the custody of any of her three children, but did want them to stay with the paternal grandparents where she could visit them. She said that she was unemployed and living with her mother. She stated that the McKees had Belinda for 10-1/2 months and had visited her since that time. After hearing this testimony, the probate judge denied the motion to vacate.

Appellants contend that the adoption order is void for lack of service of notice on Brenda Pender. That there were such irregularities in the service of notice to render that service defective is beyond question.

It is a well-settled general rule, however, that any objection to irregularities or defects in the service of process is waived unless made promptly and diligently and that defective service of process may be sufficient to constitute legal notice of a suit and support a judgment therein, so long as the service actually gives the party served notice of the proceedings. *Hunter* v. *May*, 161 Tenn. 155, 25 S.W. 2d 580 (1930); *Voorhies* v. *Barnsley*, 116 Fla. 191, 156 So. 234 (1934); *State* v. *Chillingworth*, 126 Fla. 645, 171 So. 649 (1937). See also, *Walker* v. *Carver*, 93 Fla. 337, 112 So. 45 (1927); *Gray* v. *Lawlor*, 151 Cal. 352, 90 P. 691 (1907); *Smith* v. *Collins*, 42 Mont. 350, 112 P. 1070 (1910). As pointed out in *Ely* v. *United States Coal & Coke Co.*, 243 Ky. 725, 49 S.W. 2d 1021 (1932), there is practical unanimity of authority that irregularities in giving notice will not void a judgment. Irregularities in service of process may make a judgment voidable, but not void. *Walker* v. *Carver*, supra.

Any defect in the process, the return thereon or the service thereof is cured or waived by the appearance of the defendant without raising an objection, and he is precluded from thereafter taking advantage of the defect. *Rose* v. *Ford*, supra; *Gay* v. *Hanger*, 3 Ark. 436; *Boyer* v. *Robinson*, 6 Ark. 552; *Mutual Benefit Health & Accident Ass'n.* v. *Moore*, 196 Ark. 667,

36

119 S.W. 2d 499. Filing an answer without objecting to the service is a sufficient appearance to constitute waiver when the service is either irregular or void. *Mercer* v. *Motor Wheel Corp.*, 178 Ark. 383, 10 S.W. 2d 852; *Fletcher* v. *Johnson*, 231 Ark. 132, 328 S.W. 2d 373; *Auto Sales Co., Inc.* v. *Mays*, 191 Ark. 884, 88 S.W. 2d 330; *Hibbard* v. *Kirby*, 38 Ark. 102; *Boyer* v. *Robinson*, supra. See also, *Storey* v. *Brewer*, 232 Ark. 552, 339 S.W. 2d 112; *Chapman & Dewey Lumber Co.* v. *Bryan*, 183 Ark. 119, 35 S.W. 2d 80; *Farmers Union Mut. Ins. Co.* v. *Jordan*, 200 Ark. 711, 140 S.W. 2d 430. The filing of an answer on behalf of a party by an attorney has the effect of entering a general appearance, even when there has been no process or service. *Purnell* v. *Nichol*, 173 Ark. 496, 292 S.W. 686.

An attorney who appears in court is presumed to be authorized to represent the client. *Broadway* v. *Sidway*, supra; *United Equitable Ins. Co.* v. *Karber*, 243 Ark. 631, 421 S.W. 2d 338. The burden was on Brenda to show that McKnight had no authority to appear and respond to the petition for her. *Jackson* v. *Jackson*, 199 Ga. 716, 35 S.E. 2d 258 (1945). Where court records show an entry of a defendant's appearance by a regular practicing attorney, evidence of his want of authority must be clear and satisfactory to warrant relief from a judgment against the defendant. *Jones* v. *Burgett*, 221 Ark. 866, 256 S.W. 2d 325. One having actual knowledge of the appearance of an attorney in his behalf cannot, after judgment, deny his authority on a motion to set aside the judgment. *Shoal* v. *Bailey*, 139 Mont. 198, 362 P. 2d 234 (1961).

Brenda Pender argues that she has been deprived of due process of law because of lack of notice of the hearing, relying upon *Armstrong* v. *Manzo*, 380 U.S. 545, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965). The requirements of due process of law under that decision were that she have notice reasonably calculated to apprise her of the pendency of the action and to afford her an opportunity to present her objections. These requirements of due process were met.

We have heretofore recognized that one who was apprised of the pendency of an action and aware of the nature of the relief sought before a judgment was rendered, was not en-

titled to have the judgment vacated, whether process was served on him or not. *Taylor* v. *Harris*, 186 Ark. 580, 54 S.W. 2d 701. We have also held that one, who was apprised of the pendency of a suit for partition in which he was named as a plaintiff and who took no steps to repudiate or discontinue the action he knew was being prosecuted in his behalf, was estopped to claim that the decree was void because he had not authorized the institution of the suit. *Adams* v. *Woods*, 128 Ark. 441, 194 S.W. 849. In view of the fact that Brenda Pender had actual notice of the time, place and nature of the hearing and knew that McKnight had filed an answer for her and failed to show that he was not authorized to do so, the trial judge did not err in failing to vacate the order of adoption on her motion.

## II and IV

Appellants also contend that the probate court erred in holding that the consent of the paternal grandparents, as persons lawfully entitled to custody, was not required. The court found the paternal grandparents unreasonably withheld consent to the adoption. Appellants point out that Ark. Stat. Ann. § 56-207 (a) (8) provides that consent is not required of a lawful custodian, other than a parent, who has failed to respond in writing to a request for consent for a period of 60 days, or who, after examination of his written reasons for withholding consent, is found to be withholding his consent unreasonably. Appellants contend that, since no written request was made, there could be no basis for the court's finding that consent was unreasonably withheld. The law does not require a written request for consent, or a vain and useless act. Neither does it put form above substance. These parties were served with notice. They had full opportunity to, and did, raise their objections by their response and the evidence presented. In their response, they simply stated that they did not consent. In his opening statement, appellants' attorney stated the position of appellants that blood kin was entitled to preference over strangers, that the grandparents loved their grandchild and wanted to take care of and raise her, but never mentioned the somewhat inconsistent objection that they had hope that Belinda's father might remarry and take his children to raise, or that their mother might remarry

and raise them. Furthermore, the fact that Eugene McKee was 57 years or age and Dorothy McKee, 52, was not mentioned, even though their ages were stated in the petition and established by their testimony. Appellants now speculate in their brief on appeal that, if they had been served with a written request, they might have raised these objections, but state no reason why they did not, or could not have, in their response to the petition or at sometime during the proceedings.

Appellants concede that if appellees were young people and it was a certainty that Belinda's parents were not ever, or even within the near future, going to establish a home and raise their children and, if the grandparents had previously been appointed guardians with power to consent, their refusal to consent might understandably be deemed to be unreasonable, but assert that, under the circumstances existing, it would be unreasonable for them to consent. Appellants had a full and fair opportunity to develop all these issues.

The McKees testified that they were qualified as foster parents in California as well as in Arkansas. The evidence supporting the court's finding that Belinda might well have died had it not been for the tender loving care of the McKees is clearly supported by the evidence. The McKees live in St. Francis County, in the country, 6-1/2 miles west of Colt, in a two-bedroom frame house, described by Brenda Pender as a nice home. The husband has take home-pay of $143 per week. The wife had surrendered her license as a foster parent in California, when the McKees lived there, in order to take a course in nursing for 2-1/2 years, in order that she might be better qualified to take care of children. Arkansas Social Services placed Belinda in the McKee home. They have raised three sons of their own to adulthood and Mrs. McKee testified that they have cared for 34 foster children.

Appellees maintained their interest in Belinda after she was removed from their home. The evidence showed that they visited the Pender home in order to see her and that, when they did, she displayed genuine affection and a decided preference for them. The McKees had, on occasion, taken Belinda home with them, had taken clothing to her and had

even taken the Penders a load of wood for heating their house trailer. They stated that they took the child to Sunday school and church. At their house, where only appellees live, Belinda has her own bed and her own room. Mrs. McKee testified that they keep a box of toys under the bed for her. She said that they have a real need for children in their home and that she needs children in her home for her life to be full and meaningful. Two adult sons of the McKees assured the court that, if Belinda were adopted by their parents, they would see that she had a home when their parents died. One of them said that they had always treated Belinda as a sister. The pastor of the Pinetree Baptist Church testified that the McKees were among the most faithful members of that church, that their home was clean and the environment there, good. This testimony was corroborated by this pastor's predecessor, who was then pastor of Highway Baptist Church in North Little Rock.

Arch Pender, Jr., has been unemployed for well over three years, is 50 years of age and is admittedly in very poor health. He is receiving payments from the Veteran's Administration and Social Security for disability. The total monthly income in the household is $526.95, which is derived from those disability payments and aid (AFDC) to the dependent grandchildren. Food is provided by $432 per month in food stamps, for which the Penders pay $153.

The home of Arch Pender, Jr. and Maxine Pender is a house trailer which is 10 feet wide and 65 feet long. There are three bedrooms, a bathroom, a kitchen and a living room. Arch Pender, Jr., testified that in 1977, he had been compelled by the health department to install a new sewer system and a well. At all times when Belinda has been with them, there have been not less than nine people living there. Arch Pender, Jr., and his wife have 12 living children and 6 of them live at their trailer. Their oldest daughter, who was pregnant at the time of the hearing, spends the day there and brings her two children. The place is heated by burning wood in a stove made from a 30-gallon metal oil drum. When the grandchildren were returned to this place, Arch Pender, Jr., converted some closets into a place for the grandchildren to sleep, thus providing the third bedroom.

Pat Edwards, a registered nurse with the Cross County Health Unit of the Arkansas Health Department, had visited in the Pender household twice. The occasion for her going the first time was a doctor's request that she teach the family to rid the children there of head lice. On her first visit, which was in the spring of 1977, she saw a child sitting on a bed eating an egg in a bedroom where something that appeared to be human feces was on the floor. She said that she made a lot of home visits, but had seen no home worse than that of the Penders in reference to availability of food and child care. Although she observed that there had been some improvement between her two visits, she said that when she first visited the Pender home, it was one of the worst homes she had ever seen.

Edgar Borden, the St. Francis County Juvenile Probation Officer, had made two visits to the Pender house trailer. The first was on December 13, 1977. He said that the floors were dirty and all the children's faces were dirty. On January 23, 1978, he went there with Mrs. Riley, Health Implementation Supervisor for the State Health Department in Cross and St. Francis Counties. He described the house as filthy. A girl was sweeping the floor and had accumulated a pile of dirt which included a few cans. The electrical switch or fuse box was in a bedroom and was exposed. In the bathroom, he found a pile of dirty clothes overflowing the bathtub. The closet in one bedroom was piled full of dirty clothes about as high as his head. There was a hole in the floor approximately three inches wide through which he could see snow. The only food he saw about about 75 pounds of potatoes. None of the beds had any bed clothing and one of them had no bedding.

Mrs. Riley, who went to the place in compliance with an order of the probate court to inspect the home, corroborated the testimony of Borden. The only storage space she found was one chest of drawers in a bedroom. She said that the heater was located at the opposite end of the trailer from that where it appeared that the children slept. She said that many of the window panes were missing and in spite of efforts that had been made to cover the openings, one could feel air coming in. In no way would she say that the living conditions there were satisfactory for any child.

Belinda and her brother Clifford sleep with Joanne Pender, a 17-year-old aunt, according to Arch Pender, Jr. Two uncles of Belinda and Belinda's other brother sleep in the same bedroom, but in another bed.

In his testimony, Arch Pender, Jr., attributed the piles of dirty clothes to his wife's inability to get to a laundromat. He said that all the children had respiratory infections all winter. He admitted that the three grandchildren had been returned to his home on condition that he and his wife provide a good home. But he and his wife said the specialist with the Cross County Social Services, who was supervising the matter, had recently told them that they were not living up to the bargain.

Arch Pender, Jr., testified that he had made arrangements to sell his home and was trying to buy a larger one in Missouri. There was no objective evidence of any effort on his part to carry this plan into effect. There is nothing in the record to suggest any real possibility that Arch Pender III or Brenda Pender have any intention to provide a decent home for this child or either of their boys.

Arch Pender III testified that Brenda paid little attention to the children and that she isn't much of a mother. He also testified that at the time of the hearing, he was earning $20 per day for two or three days each week at a job he had obtained after Christmas, 1977, but was paying rent of $20 per week to his sister, with whom he was living in a house trailer along with her husband and their children, and was helping buy the groceries in that household. It was admitted that he was already delinquent for two weeks in making $25 payments ordered for the support of his three children. The probability of any of appellants giving Belinda a suitable home seems slight, indeed.

Several witnesses, whose arrival at the Pender house trailer could not have been anticipated, described it as filthy. Mrs. Peeler said that there had been an improvement since she had been visiting the place, but said that the timing of her visits was usually known to the Penders. Shortly before she had notice of this hearing, she had told the paternal grandparents that, if things did not improve, she would have to

make a report to the juvenile court. There was testimony from witnesses other than the McKees about finding Belinda dirty and in wet "Pampers," with an odor of stale urine, and of seeing burns on her arms, hands and feet. Mrs. Peeler had seen mosquito bites all over Belinda's body. Belinda has been subject to seizures all her life and regular dosages of phenobarbital are necessary. She seems to be particularly susceptible to diaper rash. Arch Pender, Jr., says that she has a nervous disposition and cries more than his babies did. He admitted that he had neglected the open switch box and the exposed electrical wires. He testified that he covered it the night after testimony had been given about it.

When all the evidence is considered, it overwhelmingly supports the probate court's finding that the paternal grandparents had unreasonably withheld their consent to the adoption and that the granting of the adoption was in the best interest of the child.

The rights of parents are not proprietary and those of grandparents are even less so. Parental rights are in the nature of a trust reposed in them, subject to their correlative duty to care for and protect the child and the law secures their rights only so long as they shall discharge their obligations. *Emmons* v. *Dinelli*, 235 Ind. 249, 133 N.E. 2d 56 (1956); *Purinton* v. *Jamrock*, 195 Mass. 187, 80 N.E. 802 (1907). Parental rights are not to be enforced to the detriment or destruction of the happiness and well-being of the child. *Purinton* v. *Jamrock*, supra.

The judgment is affirmed.

BYRD, J., dissents.

PURTLE, J., not participating.