Cite as 2021 Ark. App. 24

# ARKANSAS COURT OF APPEALS
DIVISION III
**No.** CV-20-303

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF KAB, A MINOR | **Opinion Delivered:** January 20, 2021 |
| FELIX E. BRYAN AND ELIZABETH H. BRYAN, HIS WIFE | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. 58PR-18-270] |
| APPELLANTS | |
| V. | HONORABLE GORDON W. "MACK" MCCAIN, JR., JUDGE |
| DAVID CHAD FINDLEY AND VICTORIA MAE BRYAN | AFFIRMED |
| APPELLEES | |

## RITA W. GRUBER, Judge

Appellants Felix and Elizabeth Bryan appeal from a decision of the Pope County Circuit Court denying their petition to adopt KAB. On appeal, they contend that Chad Findley's consent was not required and that adoption was in KAB's best interest. We affirm.

This case began on September 28, 2018, when the Bryans filed a petition to adopt their granddaughter KAB, who was born March 16, 2017. They alleged that they acquired custody of KAB on August 6, 2017, when their daughter Victoria Bryan came to live with them. They further alleged that the consent of KAB's natural parents (Victoria Bryan and Chad Findley) was not required because each had failed significantly without justifiable cause to provide for the care and support of KAB for a period in excess of one year. The petition was served on both Victoria and Chad. Chad filed a response to the petition on November 13, 2018, admitting that he is the father and denying that his consent was not required. Victoria did not file a response or appear at the hearing on September 4, 2019.

At the time of the hearing, Felix and Elizabeth Bryan had been married for twenty-five years. Felix explained that Victoria came to live with them in Russellville in January 2016 after her first semester of college. She lived with them for about six months before moving in with Chad, whom she met at Zaxby's. KAB was born March 16, 2017, when Victoria and Chad were living together. Felix testified that Victoria had moved home on August 6, 2017, when KAB was five months old. On Thanksgiving Day 2017, Felix found "drug residue" and "opium" in Victoria's room and told her she needed to leave or get help. Victoria left without KAB. There was no discussion about what would happen to KAB, and Victoria never attempted to take her. Felix stated that Victoria was living in Mississippi, dealing with criminal charges, and trying "to get her act together."

Felix testified that he had not heard from Chad since Victoria had come to live with him in August 2017. According to Felix, Chad made no requests to see KAB and did not pay any support. On cross-examination, Felix agreed that if an obligation had been owed to KAB, it would have been owed to Victoria, not him and Elizabeth. Felix did not notify Chad that Victoria had left on Thanksgiving Day because he did not know how to contact him but did know he lived in Eureka Springs. Felix never asked Chad for any support or assistance; he did not want any contact with Chad. Felix was unaware of whether Victoria had gone to Chad's apartment after moving home in August 2017 or received anything from him. On redirect, Felix said that he saw nothing to suggest that Victoria was getting support from Chad during the time she was living with Elizabeth and him.

Elizabeth Bryan was not aware of any support paid to Victoria after August 2017. She stated there was nothing stopping Chad from paying support to her and Felix. She said Chad makes no effort to keep up with KAB's progress and does not ask for pictures. On

2

cross-examination, Elizabeth acknowledged that she did nothing to encourage a relationship between KAB and her father. She had not spoken to Chad since Victoria moved back home in August 2017. Elizabeth was aware that Victoria went to Chad's on occasion after moving back home. She had not been contacted by Chad, but Chad's mother had texted her after the adoption petition had been filed asking to see KAB. Elizabeth said she spoke to her attorney and felt that it was better to wait until after the hearing because KAB was not familiar with anyone in Chad's family.

Following Elizabeth's testimony, the Bryans rested. Teresa McEntyre was the first witness to testify in opposition to the adoption petition. Her daughter, Keri Findley, had been married to Chad with whom she has a son. Teresa was aware that Chad and Victoria separated in August 2017, and she had seen Victoria and KAB at Chad's apartment after they separated on several occasions when Teresa picked up her grandson. Teresa recalled an occasion when KAB was at the apartment and Victoria came into the apartment and picked up KAB, along with the "bags of diapers and whatever was in there." At this time, she saw Chad hand Victoria "folded money." She was not aware how much money was given but saw a $20 bill. On cross-examination, Teresa acknowledged that she did not know what the money was for or whether it was for the Bryans, KAB, or Victoria.

Keri Findley testified that she had been married to Chad for fourteen years before they divorced in 2014. They have an eight-year-old son together, who is autistic and nonverbal. Keri testified that Chad picked up their son from school every day in 2017, and she or her mom would pick him up from Chad's when they got off work. She was also aware of Chad and Victoria's separation in 2017. She stated that she saw Victoria when she picked up her son and also heard conversations between Chad and Victoria concerning

3

supplies and money for the benefit of KAB. Keri said that she would see Walmart bags with "diapers and stuff for the baby" and saw Victoria leave with the bags on five or more occasions. She heard Victoria talking to Chad about needing money for a doctor visit but never saw money exchange hands.

Lana Findley, Chad's mother, testified that she was familiar with Victoria and Chad both before and after their separation in 2017. She saw Victoria and KAB at the apartment after they separated. She said that she saw Chad give Victoria money on numerous occasions, maybe twenty times but not more than fifty times. She said she was confused as to why they were apart but said that Victoria would bring the baby to see Chad, "make note that she needed something," and Chad would give her money. On cross-examination, Lana said she did not know the purpose of the money given to Victoria.

Chad Findley testified that he and Victoria were living together in a one-bedroom apartment when KAB was conceived. They moved to a two bedroom to have a nursery for KAB. He confirmed that they separated in early August 2017. He said that Victoria did not work when they lived together, but he worked two jobs. Chad testified that after he and Victoria's separation, Victoria brought KAB over and he would watch her while Victoria did schoolwork. He provided money and supplies directly to Victoria and not to the Bryans. He gave Victoria money for things she needed, doctor visits, and prescriptions. He said he bought things for Victoria to take back home, such as food, diapers, nail clippers, and a "snot sucker." He indicated that Victoria was there daily immediately after they separated, but the visits slowly became less frequent. When asked if he supported KAB through Victoria, he responded "definitely." He recalled buying a Christmas tree in 2017 for KAB and putting presents under it, including a North Face jacket.

4

Chad explained that Victoria had a debit card on their joint bank account. After an incident in which Victoria stole money from Chad's mom and incidents when he felt Victoria was not being honest with him, he was reluctant to give her cash but did so when he felt it was necessary. After their separation, Chad monitored the account more closely because he feared that Victoria would use the "card and take money that she might not be using for the baby." As a result, he would take most of the money that was direct-deposited out of the account.

Chad stated that he sent a "long thought out" text message to Felix when Victoria did not respond to him and "pleaded" to see KAB just before her first birthday, but Felix did not respond. He heard from Victoria shortly thereafter but never reached back out to the Bryans because he felt there would be "consequences." He elaborated that he was afraid that he would get the cops called on him and did not want a record of being "that guy that was trying too hard to see his daughter." Chad testified that the Bryans were not supportive of his and Victoria's relationship from the beginning and did not like that he was sixteen years older than her. He said from Christmas 2017 until March 2018, it became harder and harder to see KAB. The last time he saw KAB was on March 9, 2018, but stated he continued to give money and items to Victoria until that point but did not know how Victoria used the money. He said he felt an obligation to support KAB and took Victoria at her word that she would use it for their daughter.

Chad moved to Eureka Springs about two months after he stopped having contact with KAB. He had worked at the Crescent Convention Park Hotel since May 2018 and was recently promoted to sales associate. Keri and his son had moved to Fayetteville, and he tried to visit them as often as he could to help them. He also worked a second job at Best

5

Western trying to "get money to get a lawyer to do a paternity case and get some custody, visitation rights in, in some fashion." During this time, he received the adoption petition, hired a lawyer to defend the petition, and filed a paternity action. He had been unable to obtain service of the paternity action on Victoria.

On cross-examination, Chad explained that he took money out of the joint bank account to make it virtually impossible for Victoria to make withdrawals, but he did not keep either supplies or support from KAB. His purpose in draining the bank account was to prevent Victoria from taking money without his permission. He said he physically purchased things Victoria told him she needed instead of giving her cash to buy them because he did not trust her. Chad admitted that Victoria used opioids. By March 2018, he reached a point where he could not count on Victoria to provide him any "connection" with KAB. He understood the child-support process having dealt with his ex-wife and knew he had a duty to support his child whether a court ordered him to do so. When counsel stated that it looked like he would owe $35 a week in child support based on the child-support chart working forty hours a week at minimum wage and asked if he ever paid that much, Chad replied "at least." When asked why he did not try to pay support, he stated that his daughter was being kept from him against his will and he needed to put that money toward a process that would enable him to see his daughter.

When asked by the court why he did not provide money to the Bryans, Chad stated that they did not like him, did not want him in KAB's life, and did not have that type of "communication level." Chad explained that he trusted Victoria with money more when she was at the Bryans because she was "policed" on her activities. Chad admitted that he did not have receipts for items purchased during the separation and that he did not document

6

cash given directly to Victoria. He did leave about $35 a week in the account for her to access and stated that the bank records showed she used her card. He admitted, however, that there was nothing to show it was her card but that he never took out small amounts. The court noted two small withdrawals after their separation.

The circuit court took the case under advisement and asked both parties to submit findings of fact and conclusions of law. On January 30, 2020, the circuit court denied the Bryans' adoption petition. The order provided that the court adopted and incorporated, in part, Chad's proposed findings of fact and conclusions of law. These included the following: Chad and Victoria never married but were cohabitating at the time of KAB's birth on March 16, 2017; Chad and Victoria separated in August 2017 after which Victoria and KAB lived with the Bryans for a period of time; Chad maintained contact with KAB from August 2017 until March 2018 when communication between Chad and KAB ceased; Chad was not under a court order to pay support to Victoria; the Bryans failed to contradict evidence that tended to show that Chad contributed cash or goods to Victoria; the testimony and exhibits showed that Chad provided money and goods to Victoria for KAB's benefit between the months of August 2017 and March 2018, and the money and goods provided were significant and meaningful during that timeframe; the petition for adoption was filed September 28, 2018; and the Bryans failed to prove by clear and convincing evidence that Chad willfully or intentionally failed to provide meaningful support for KAB for a period of one year. The Bryans timely appealed from the January 30 order.

We review adoption proceedings de novo. *In re Adoption of S.C.D.*, 358 Ark. 51, 186 S.W.3d 225 (2004). We give due regard to the opportunity and superior position of the circuit court to determine the credibility of witnesses, and we have stated that the

7

personal observations of the circuit court are entitled to even more weight in cases involving the welfare of a small child. *Holloway v. Carter*, 2019 Ark. App. 330, 579 S.W.3d 188. We will not reverse a circuit court's finding regarding whether consent is unnecessary due to failure to support or communicate with the child unless it is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

Consent to adoption is not required of a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree. Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2015). "Failed significantly" certainly does not mean "failed totally." *Racine v. Nelson*, 2011 Ark. 50, at 13, 378 S.W.3d 93, 100 (citing *Pender v. McKee*, 266 Ark. 18, 582 S.W.2d 929 (1979)). It means only that the failure must be significant, as contrasted with an insignificant failure. *Id.* It denotes a failure that is meaningful or important. *Id.* The one-year period may be any one-year period, not necessarily the one immediately preceding the filing of the adoption petition. *Id.* However, in *Martini v. Price*, 2016 Ark. 472, at 6, 507 S.W.3d 486, 490, our supreme court stated, "Although we have held previously that the one-year period referenced in section 9-9-207 can be any one-year period and is not required to be the one-year period immediately preceding the filing of the adoption petition, we believe that circuit courts should consider the parent's conduct, particularly in the period before the filing of the petition, in determining whether the parent's consent to an adoption should be required." There is a heavy burden placed on the party seeking to adopt a child without the

consent of a natural parent to prove the failure to communicate or the failure to support by clear and convincing evidence. *Racine, supra.*

The Bryans first argue that the circuit court erred in finding that Chad's consent was required. The Bryans filed their adoption petition on September 28, 2018, and alleged that they acquired custody of KAB in August 2017 and that Chad's and Victoria's consent was not required because they failed significantly and without justifiable cause to provide for the care and support of KAB as required by law or judicial decree for a period of more than a year. At the hearing, counsel for the Bryans indicated that the one-year period at issue was the year prior to the filing of the adoption petition. It is undisputed that Chad did not provide support after March 2018. The Bryans contend that the support Chad provided from August 2017 to March 2018 was not "significant enough" to require his consent under the statute.

Here, Chad testified that after he and Victoria separated in August 2017, Victoria continued to visit his apartment with KAB. He testified that he had provided baby supplies as well as cash to Victoria for medication and doctor visits. He also testified that Victoria kept a debit card from their joint account after their separation, and his records showed two withdrawals totaling around $90. While he did not trust her, noting her opioid use, he always left a small amount accessible to her and was always willing to provide her with items. When the Bryans' lawyer stated that it looked like Chad would owe $35 a week in child support based on the child-support chart working forty hours a week at minimum wage and asked if he ever paid that much, Chad replied "at least." Chad testified that after Christmas 2017, it became harder and harder to see KAB but that he continued to give money and items to Victoria until March. The last time he saw KAB was on March 9, 2018.

Chad's witnesses, including his mother, his ex-wife, and his ex-wife's mother, testified that they observed Victoria and KAB at his apartment during the relevant time period. Teresa McEntyre, his ex-wife's mother, testified that she saw Victoria pick KAB up from Chad's along with bags of diapers and other items. She also saw Chad hand Victoria "folded money." Chad's ex-wife, Keri, saw Victoria leave Chad's apartment on four or five occasions with Walmart bags filled with diapers and items for KAB and overheard conversations between them concerning supplies and money for KAB's benefit. Lana, Chad's mother, testified that she saw Chad give Victoria money on numerous occasions, which she described as maybe twenty times but not more than fifty times.

The Bryans argue that *Pender*, 266 Ark. 18, 582 S.W.2d 929, supports their argument that Chad's support was not significant. We disagree. In *Pender*, the child to be adopted was in the custody of numerous parties from December 1975 to September 1977. The father admitted that when the child was in the custody of the McKees, which was six to ten months, he contributed nothing to her support. He also admitted he contributed to support the children when in the custody of social services for four and a half months. Although the record was unclear whether the father was under a court order of support, he conceded that he was required by a Missouri court at one time to pay $205 monthly to his wife. He claimed he made three $205 payments but admitted that neither his wife nor anyone else acknowledged receiving any payments. Unlike *Pender*, Chad was not ordered by a court to pay child support at any point, and the Bryans did not contradict evidence that he provided money and items to Victoria for the benefit of KAB.

In addition, the Bryans argue that *Racine, supra*, supports their case. There, our supreme court affirmed circuit court's decision that the father failed significantly to support

the child where the only evidence of support throughout the child's life was a $750 check dated May 2006. *Racine*, 2011 Ark. 50, at 13, 378 S.W.3d at 101. The child had been born in December 2006; the adoption petition had been filed in January 2008. Contrary to the present case, there had been no support in the one-year period prior to the adoption petition. Although the Bryans suggest that cases involving "significant" failure to communicate are helpful to determine whether a parent has failed "significantly" to support, we are not persuaded in the present case. *See, e.g.*, *Shorter v. Reeves*, 72 Ark. App. 71, 32 S.W.3d 758 (2000) (biweekly phone calls during the relevant one-year period, along with one three or four hour visit and one week with the child, was not significant where mother made no attempt to see child despite living in close proximity); *Vier v. Vier*, 62 Ark. App. 89, 968 S.W.2d 657 (1998) (father admitted he failed to communicate but claimed it was justifiable).

The Bryans also argue that Chad did nothing to establish either paternity or the "level of support required by him." They cite no cases to support this argument that either was required, although they do suggest that his failure to take formal steps is similar to the mother's failure in *Rodgers v. Rodgers*, 2017 Ark. 182, 519 S.W.3d 324, to take advantage of the legal tools available to her to gain custody rights. Their reliance on *Rodgers* is misplaced because it involved whether the mother's failure to communicate or support for more than a year was justifiable. The circuit court held that the mother's failure was not justifiable, and our supreme court affirmed stating that the mother's sole argument that the circuit court's order prohibiting her from exercising visitation was justifiable cause to have no communication at all with her children was unavailing. *Id.* at 7, 519 S.W.3d at 329. The court noted that the mother could have communicated with her children in other ways,

11

such as making telephone calls or sending birthday or Christmas cards, letters, or emails; failed to attend any school, church, or sporting events or to show an interest in the children although she lived in close proximity; and failed to file a petition to reinstate her visitation after she was drug-free. *Id*. at 5–6, 519 S.W.3d at 328.

Finally, the Bryans argue that Chad failed to provide them any support for KAB as they were the ones caring for KAB. They state that while there is no case directly on this point, *Pender*, *supra*, "hints at the issue." The child in *Pender* had been in the care of multiple people during the relevant time period, and the father argued that his failure to support was justifiable because when the child was not in his custody, he was not responsible for all the child's support. Our supreme court disagreed stating that the fact that someone else had custody did not relieve the father of his obligation. In the present case, the issue of whether a failure of support was justifiable was not argued or decided below.

Here, the circuit court found that the testimony and exhibits showed that Chad provided money and goods for KAB by giving them to Victoria for the months of August 2017 through March 2018 and that the money and goods provided were significant and meaningful during that time frame. As a result, the court found that the Bryans failed to prove by clear and convincing evidence that Chad had willfully or intentionally failed to provide meaningful support for KAB for a period in excess of one year. Based on our de novo review, we are not left with a definite and firm conviction that that circuit court made a mistake in finding that that Chad's consent was required.

Because we affirm the circuit court's decision that Chad's consent was necessary and was not given, we need not address the Bryans' second argument, which was that the circuit court erred in holding that the adoption would not be in KAB's best interest. *See* Ark. Code

Ann. § 9-9-214(c) (Repl. 2015) (providing in part that adoption petition may be granted if the court determines that the required consent is excused and that the adoption is in the best interest of the child); *Dixon v. Dixon*, 286 Ark. 128, 689 S.W.2d 556 (1985).

Affirmed.

WHITEAKER and VAUGHT, JJ., agree.

*Josh Sanford*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellants.

*Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor*, *Tasha C. Taylor*, and *Tory H. Lewis*, for appellees.