WALDRON *v.* CHILDERS.

Opinion delivered June 10, 1912.

1. PARENT AND CHILD—CUSTODY OF ILLEGITIMATE CHILD.—The mother's right to the custody and control of an illegitimate child is superior to that of any one else. (Page 210.)

2. SAME—RIGHT TO CUSTODY OF CHILD.—Unless a parent is incompetent or unfit, because of poverty or depravity, to provide the physical comforts and moral training essential to the life and well-being of his child, no court will deprive him of the right to its custody, so long as he desires to maintain the parental relationship. (Page 211.)

3. SAME—RIGHT TO CUSTODY OF CHILD—RELINQUISHMENT.—A parent can not by contract relinquish the right to the custody of his child. (Page 211.)

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

STATEMENT BY THE COURT.

This appeal involves the right of custody to a boy three years of age. The appellant claimed that when she was seventeen years of age she had intermarried with one Wriggin.

She states that she became attached to Wriggin, and he asked her to marry him. She consented, but her mother objected to the marriage, and she and Wriggin agreed that they would marry any way and keep it a secret. The ceremony was said by a man who represented himself to be a justice of the peace. They were married in November, 1907, lived together until March, 1908, as man and wife, when Wriggin left her, as she understood, temporarily. She wrote him and received letters, but the last letters she wrote him were unanswered. She disclosed to her mother in August, 1908, that she was pregnant. The infant in controversy was born in November, 1908.

Mrs. Hall, the mother of appellant, having heard that Wriggin had probably gone to Little Rock and seeing an advertisement in the paper of a sanitarium owned by one Doctor Shoppach, determined to bring appellant to Little Rock and place her in the sanitarium where she supposed appellant could receive better treatment than she could at home; and also their purpose was, if possible, to locate the father of the child in Little Rock before disclosing the identity of the child.

Mrs. Hall was with her daughter at the sanitarium when the child was born. She desired to leave the child with some responsible person until she could arrange her business affairs in Chattanooga, where she lived, and Doctor Shoppach suggested the appellee, who was then Mrs. Rhodes, as a suitable person to take charge of the child. When the baby was nine days old, Mrs. Rhodes came to the sanitarium with a little colored girl, and, by an arrangement with Mrs. Hall, took charge of the baby.

Mrs. Hall states that Mrs. Rhodes "agreed to take the baby, and came to the sanitarium for it;" that her daughter was excited when the baby was taken away, and that she never did consent or agree that the child should be taken by any body, but, on the contrary, was violently protesting. Witness promised her daughter that if the latter would give her consent it would not be but a short time before the baby would be restored to her. She says that in response to that the appellant "covered her head and cried," but did not consent.

After this disposition was made of the child, Mrs. Hall and the appellant returned to Chattanooga. Mrs. Hall stated that she talked with Mrs. Rhodes, told her that they wanted

to hear from the baby regularly; that the appellant was present, but crying, and took no part in the conversation; that Mrs. Rhodes understood that appellant was to come for the child as soon as matters were adjusted. She wanted to find Wriggin, and have the marriage made public. The mother had made investigation to ascertain as to whether or not her daughter was married to Wriggin, but she had found no marriage certificate.

The testimony on behalf of appellant tends to show that it was her object, and her mother's purpose, to conceal the illegitimacy of the child if it should be ascertained that appellant was not in fact married to Wriggin; that she believed she was so married, and that her mother so believed; but, if in fact she had been deceived as to that, then she wished to conceal the birth of the child.

Appellant, in June, 1910, intermarried with one Waldron. Before the marriage he investigated and reported that Wriggin was dead. The testimony discloses that appellant and her husband have a home in Memphis. Waldron is a decorator, and seeks work at different places, but when he is away from home appellant is with him much of the time. He receives about $100 per month as an interior decorator. There was proof tending to show that he is an educated man and a man of refinement; that he is willing and anxious to have the child; that they have no children of their own, and that Waldron is desirous that appellant have the custody of the child.

The testimony on behalf of appellant discloses that she has an affection for the child, and that it has always been her intention to get it and take care of it She stated that she had lived in but one place since she married Waldron, had gone about to different places, but her permanent home was in Memphis, Tennessee; stated that she and her husband were buying property there.

She gives as a reason why she did not visit the child during the interval between the time Mrs. Rhodes took possession of it and the time of her marriage that she could not ascertain its whereabouts; states that her father was ill, and she was still trying to find Wriggin, whom she supposed to be her husband; states that she wrote a number of letters to Mrs. Rhodes before she came to Little Rock. She came to

Little Rock before she intermarried with Waldron, and states that she told Mrs. Rhodes then that she would leave the baby a little longer, but that she intended to go to Chicago and expected to get married there. Every time she wrote Mrs. Rhodes stating that she desired to come and see the child, Mrs. Rhodes would immediately write back that she was going away, or she had bought a ticket to leave, or something to that effect. She says that her mother's people are amply able and willing to take care of the child, and are willing that she and her boy should live with them all the time she desires; that her husband is also willing and anxious for her to have the child.

The testimony on behalf of appellant also tends to show that she and her mother had made repeated efforts after the marriage with appellant Waldron to locate the child, and that they had finally succeeded in locating him at Alexander, in Pulaski County, and, upon the refusal of appellees upon demand to surrender possession, that she had sued out a writ of habeas corpus.

The testimony of the appellee tends to show that about 7:30 o'clock at night some one knocked at her door, and that they opened the door and found the baby wrapped in a blanket lying in a rocking chair; that it had been a cold, rainy day; that she took charge of the baby; had kept it all the time since. The preponderance of the testimony is to the effect that Mrs. Rhodes herself placed the baby in the rocking chair, that her husband (Rhodes) objected to her having another baby, and she had placed it there so that he would not think that she had anything to do with taking it, that it might appear that they had merely found the baby. Appellee, Mrs. Childers, stated that she was as devoted to the baby as if it were her own child. Her evidence further discloses that the mother had done nothing for the baby; had never written but one letter; that she never knew of appellant until the 26th day of June, 1910; that she and her husband are abundantly able to take care of the child, and that they are anxious to do so; therefore she refused to surrender him.

From the judgment of the court awarding the custody of the child to the appellees the appellant has duly prosecuted this appeal.

*Bradshaw, Rhoton & Helm,* for appellant.

1. Under the law the mother is entitled to the custody of a child; especially as against a stranger. 22 Ark. 99; 32 *Id.* 96; 37 *Id.* 27; 2 Bish. on Mar. & Div. 1164; 21 A. & E. Ency. 1037; 29 Cyc. 1585, 1590; 44 Ark. 432; 64 *Id.* 518; 78 *Id.* 193.

2. The mother is financially able to support the child. 85 Ark. 471; 95 *Id.* 355; 50 *Id.* 351.

*Gus Fulk,* for appellee.

1. A parent may forfeit the paramount right to the custody of a child. 37 Ark. 30; 78 *Id.* 193.

2. The chancellor had before him all the parties. He acted for the best interests of the child. His decision is very persuasive, and no abuse of discretion is shown.

WOOD, J., (after stating the facts). It was conceded by the appellees that the appellant is the mother of the child. Without going into detail in a discussion of the evidence, we are of the opinion that the foster mother, Mrs. Childers, is tenderly devoted to the young life that was left in her keeping, and that if she could be permitted to retain the custody of the child she would give it the best of attention, and that the child would be well provided for in every way possible for one in her situation and bearing the relation that she sustains to the infant. But the testimony on behalf of appellant tends to show that she is also amply able to provide for the necessities of the child, and to properly maintain and educate it, and she is willing and anxious to do so. The appellant's mother testified that she wanted "to pay all the expenses of the baby," but the appellees were unwilling to surrender the child under any circumstances.

Now, even if the grandmother and the mother left the child in the custody of the appellee under the circumstances detailed by them, that would not give the appellee the right to retain the permanent custody of the child, nor would the appellee, Mrs. Childers, have such right if she had obtained possession of the child in the manner disclosed by her testimony. Even if the child were illegitimate, as a general rule, the mother's right to the custody and control of same would be superior to that of any one else. *Lipsey* v. *Battle,* 80 Ark. 289; 5 Cyc. 637.

We are of the opinion that the best interests and well being of the child do not demand that this general rule be changed in the present case. As was said in the case cited, "it is a matter of great delicacy for the courts to take the custody of a child from its parents, and this should only be done when the well being of the child imperatively demands it."

In *Baker* v. *Durham*, 95 Ark. 355, this court, speaking of the rights of the father to the custody of his child, used the following language: "It must be an exceptional case where the evidence shows such lack of financial ability or such delinquencies in character on the part of the father as to imperil the present and future welfare of his child before a court of chancery will deprive him of the duty and the privilege of maintaining and educating his child, and of the pleasure of its companionship." The same rule applies in a contest between a mother and a stranger in blood as to the custody of her child. "Unless a mother is incompetent or unfit, because of poverty or depravity, to provide the physical comforts and moral training essential to the life and well being of her child," no court should deprive her of the right to its custody so long as she desires to maintain the parental relationship and to observe its obligations and enjoy its privileges and pleasures. She could not by contract voluntarily relinquish this right to other hands, for such an agreement would be without consideration and void; it would be against public policy and not strictly enforcible. *Washaw* v. *Gimble*, 50 Ark. 351.

Judge RIDDICK, speaking of the mother's right to the custody of an illegitimate child, in *Lipsey* v. *Battle, supra,* said: "This right is founded on the fact that the natural love and affection of a mother for such a child would probably be greater than that of any one else, and that the best interest of the child will greatly be subserved by allowing it to remain in her custody."

We are convinced, from a consideration of the entire evidence, that the appellant is neither unable financially nor unfit mentally or morally to properly care for her own offspring, nor has she by her conduct created associations and environments for her child with appellees which it would be inequitable and improper for a court of equity to disturb.

The proof discloses that there was a willingness on the

part of appellant to compensate appellees for their expense and trouble in taking care of the child during the time it was committed .to them.

Under these circumstances, although the proof discloses a strong affection on the part of the appellees, especially on the part of appellee Mrs. Childers, for the infant and a desire to continue to provide for him, nevertheless there is nothing to warrant a conclusion that the appellant is lacking in the natural affection of a mother, which is stronger and more sacred than that of any other, and which entitles her, under the law and the evidence here, to the relief sought. The judgment is therefore reversed, and a decree will be entered here awarding to appellant the custody of the child.