Rusty Wayne ESCOBEDO *v.* Mark NICKITA
and Jennifer Nickita

05-315                                                231 S.W.3d 601

Supreme Court of Arkansas
Opinion delivered March 9, 2006

*Jim D. Johnson, P.A.*, by: *Jim D. Johnson*, for appellant.

*Jack and Holly Martin, Attorneys*, by: *Jack L. Martin*, for appellees Mark and Jennifer Nickita.

*Mike Beebe*, Att'y Gen., by: *Asheton M. Carter*, Ass't Att'y Gen., for appellee, State of Arkansas.

JIM GUNTER, Justice. This appeal arises from the circuit court's order in an adoption case, granting the petition for adoption and finding that neither notice to nor consent from appellant, the putative father, Rusty Escobedo, was required. The circuit court's order also dismissed as moot Mr. Escobedo's petition for paternity, which had been consolidated with the adoption matter. Mr. Escobedo files this appeal, claiming that the circuit court erred in granting the adoption without notice or consent, and asks us to reverse the circuit court's order, dismiss the petition for adoption, and remand the case for further hearings on his petition for paternity and custody. We affirm.

Appellant, Mr. Escobedo, and the child's mother, Misty Ford, had a brief romantic relationship which resulted in an unprotected sexual encounter in March of 2004. Appellant did not see or talk with Ms. Ford after this encounter, and did not know that the encounter had resulted in Ms. Ford's pregnancy. Ms. Ford was also romantically involved with another man, Billy Ray Gibbins, at the time. On December 3, 2004, Ms. Ford gave birth to a baby girl. Two weeks before the birth, on November 19, 2004, appellees, Mark and Jennifer Nickita, filed a petition for adoption of Ms. Ford's unborn child, alleging that the father was unknown.

On the day of the baby's birth, Ms. Ford relinquished her parental rights and consented to the adoption of the baby by appellees. DNA testing excluded Mr. Gibbins as the father. The parties dispute whether appellant had sufficient information to be able to contact Ms. Ford prior to the birth, but agree that he did not contact her during the pregnancy and was not aware that she

was pregnant. Appellant first learned that his sexual encounter with Ms. Ford had resulted in a pregnancy and the birth of a child in December of 2004. On December 14, 2004, appellant was served with a summons, petition for adoption, notice of hearing, and notice of deposition. He was deposed by appellees' attorneys on December 16, 2004. At the deposition, a DNA test was administered. On December 20, 2004, appellant appeared at the adoption hearing without an attorney and immediately requested the results of the paternity test. When asked by the circuit court, appellees' attorney admitted that the paternity test indicated that appellant was the biological father.

On December 30, 2004, appellant filed (1) a response to the petition for adoption, requesting the court to dismiss the petition, and (2) a petition to establish paternity, asking the court to determine that he was the biological father of the baby and to grant primary custody of the baby to him. On January 3, 2005, appellant filed his information with the putative-father registry. On January 13, 2005, he filed an amended response to the petition for adoption, attaching the registry filing and a copy of the paternity test showing the probability of parentage of 99.99%. He amended his response, adding a claim that the adoption statutes violated his right to due process. In light of appellant's constitutional challenge to Arkansas statutes, the circuit court granted the State's motion to intervene on February 23, 2005.[1] On March 2, 2005, the circuit court entered an order granting the adoption and dismissing the petition for paternity as moot. Appellant filed this appeal. At this point, the baby was almost three months old.

## I. Ark. Code Ann. § 9-9-206(a)(2)

Appellant's first point on appeal is that the circuit court erred in finding that his consent to the baby's adoption is not required. He contends that his consent is required pursuant to Ark. Code Ann. § 9-9-206(a)(2) (Repl. 2002), because he has "otherwise legitimated" the child. Our task is twofold: to interpret the meaning of "otherwise legitimated" and to determine whether appellant has "otherwise legitimated" the child in this case.

Our standard of review is *de novo*, as it is for this court to decide what a statute means. *In re Adoption of SCD*, 358 Ark. 51, 186 S.W.3d 225 (2004). We are not bound by the decision of the

---

[1] *See* Ark. Code Ann. § 16-111-106(b) (Repl. 2006) (State must be notified and is entitled to be heard when constitutionality of statute is challenged).

circuit court, but unless it is shown that the circuit court's interpretation was wrong, we will accept its interpretation on appeal. *Id.* We turn now to the statute in issue.

Ark. Code Ann. § 9-9-206 (Repl. 2002)[2] governs persons who are required to consent to the adoption and states in relevant part as follows:

> (a) Unless consent is not required under § 9-9-207, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by:
>
> . . . .
>
> (2) *The father of the minor if the father* was married to the mother at the time the minor was conceived or at any time thereafter, the minor is his child by adoption, he has custody of the minor at the time the petition is filed, or he *has otherwise legitimated the minor* according to the laws of the place in which the adoption proceeding is brought[.]

*Id.* (emphasis added).

Notice of the filing of an adoption petition must be given to any person whose consent to the adoption is required, but who has not consented. Ark. Code Ann. § 9-9-212 (Repl. 2002). In addition, Ark. Code Ann. § 9-9-224 requires that, "[w]hen information concerning the child is contained in the putative father registry *at the time of the filing of the petition for adoption*, notice of the adoption proceedings shall be served on the registrant . . . ." *Id.* (emphasis added). At the time the petition for adoption was filed, two weeks before the baby was born, appellant would not have been entitled to notice under either of these statutes. Appellant does not argue otherwise.

Appellees argue that because appellant was not entitled to notice, he was not required to consent. They argue that if he had not been given notice, he would not have been aware of the child's

---

[2] We note that this statute was amended by Act 437 of 2005, which removed the language "he has otherwise legitimated the minor according to the laws of the place in which the adoption proceeding is brought" and added the following language "he has a written order granting him legal custody of the minor at the time the petition for adoption is filed, or he proves a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption is filed[.]"

birth, he would never have taken any acts to legitimate the child, and the court could have entered the order for adoption immediately after the hearing. They claim that it would be a bizarre result for us to find that appellant's consent was necessary due to actions he took *after* a hearing of which he was not required to be notified.

We disagree. While we agree that the statutes did not require that notice be provided to appellant at the time the petition in this case was filed, appellant was notified of the hearing, and he attended. It is not relevant for purposes of Ark. Code Ann. § 9-9-206(a)(2) how he became aware of the birth of his child. What matters is whether he has "otherwise legitimated the minor[.]" *Id.* If he has, his consent is statutorily required for adoption; if he has not, it is not.

We had the opportunity to interpret what is meant by the language "has otherwise legitimated the minor" in *In re Adoption of SCD*, 358 Ark. 51, 186 S.W.3d 225 (2004). In that case, the putative father, TF, registered with the Arkansas Putative Father Registry before the child was born. *See* Ark. Code Ann. § 20-18-702 (Repl. 2005). Upon the baby's birth, the mother immediately put the child up for adoption. The petition for adoption was filed the day after the birth. TF received notice of the petition for adoption and filed a response and a petition for determination of paternity, seeking custody if he were determined after testing to be the child's biological father. After admitting the results of a paternity test that showed a 99.99% probability that TF was the father and declaring TF to be the baby's father in the paternity hearing, the court denied the adoption petition, finding that TF had legitimated the baby in accordance with Ark. Code Ann. § 9-9-206(a)(2), and that his consent was required for adoption.

We affirmed, holding that TF legitimated the child by registering with the putative-father registry, petitioning for a determination of paternity, and taking significant steps to prepare for having the baby with him in the event he was awarded custody. *Id.* at 56, 186 S.W.3d at 277. We quoted the following Black's Law Dictionary definition of "legitimate": "to make lawful; to confer legitimacy; *e.g.*, to place a child born before marriage on the legal footing of those born in lawful wedlock." *Id.* at 56, 186 S.W.3d at 227 (quoting *Black's Law Dictionary* 901 (6th ed. 1990)). We then quoted Ark. Code Ann. § 9-10-108(b) (Repl. 2002), which states that the "registration of the father with his consent in the putative father registry . . . shall constitute a prima facie case of establishment of paternity, and the burden of proof shall shift to the

putative father to rebut such in a proceeding for paternity establishment." Finally, we stated that the fact that TF did not file his paternity petition until a few days after the petition for adoption was filed did not preclude a finding that he "otherwise legitimated" the baby. *Id.* at 56, 186 S.W.3d at 227. We noted that there was no explicit time period set forth in Ark. Code Ann. § 9-9-206(a)(2) in which the father must have accomplished the legitimation. *Id.*

Turning to this case, appellant argues that the following actions legitimated the baby: (1) submission to DNA testing on December 16, 2004; (2) appearance at the December 20, 2004, hearing to contest the adoption, request custody, and request an opportunity to raise the baby; (3) timely filing a response to the adoption on December 30, 2004; (4) filing a petition to establish paternity on December 30, 2004; and (5) establishment of paternity at the December 20, 2004, hearing when the results of the DNA test were admitted in court and the appellees' attorney stated that appellant was the biological father of the child.

Unlike the father in *In re Adoption of SCD*, appellant did not timely register with the putative-father registry and does not claim that his untimely registration legitimated his child.[3] We recognize that appellant did submit to a paternity test, the results of which indicated that he was the biological father. However, the establishment of a biological connection does not legitimate a child. It is merely a first step.

Appellant also claims that his filing of a petition for paternity on December 30, 2004, legitimated the baby. Appellees argue that we should not consider his petition for paternity in determining whether he has "otherwise legitimated" the child because it was filed after the adoption hearing. Appellant responds, arguing that we stated in *In re Adoption of SCD* that the putative father's failure to file his petition for paternity until after the petition for adoption was filed did not preclude a finding that he "otherwise legitimated" the baby.

We find that the facts in *In re Adoption of SCD* are distinguishable from the facts in this case. In that case, the father filed a petition for paternity within days of the filing of the petition for

---

[3] The registry is authorized to accept putative-father information prior to the birth of the child or at any time "prior to the filing of a petition for adoption." Ark. Code Ann. § 20-18-702(c) (Repl. 2005).

adoption. Moreover, his petition for paternity was filed over three months before the adoption hearing. Here, not only was appellant's petition for paternity filed over a month after the petition for adoption, but it was filed over a week after the hearing on the adoption petition. While we did indicate in *In re Adoption of SCD* that there is no "temporal restriction" in the statute regarding whether a father has "otherwise legitimated" his child, we do not find that appellant's actions in this case are similar to the father's actions in *In re Adoption of SCD*. Filing the petition for paternity over a week after the adoption hearing does not sufficiently "indicate his interest in and willingness to confer legitimacy on the child." *Id.* at 57, 186 S.W.3d at 227.

Finally, in *In re Adoption of SCD*, we relied on the fact that the father in that case had taken significant steps to prepare for having the baby with him if he was awarded custody, stating:

> TF took additional steps after filing his paternity petition that clearly indicate his intent to legitimate the child. For example, he testified that he was pursuing a bachelor of science degree from Baylor University. In addition, he stated that he wanted to be "responsible for [the baby] in his growth and development," and that he would allow IT to be as involved in the baby's life as she wanted to be. When asked what he had done to prepare for raising the baby, TF stated that he had called and interviewed several day cares in the Waco, Texas, area, and had also looked into finding a pediatrician and health insurance for his son. TF testified that, if he were awarded custody, he would take his son with him to Baylor, and his (TF's) mother planned to follow him down there to help out until TF and the baby could get established.

*Id.* at 58, 186 S.W.3d at 229.

The record does not reflect that appellant has taken any such "significant steps" here. At the time of the hearing, appellant had been living with a girlfriend for about a month and was working twelve-hour shifts, five days a week in a manufacturing plant for eight dollars an hour. He had been at this job for about two months. He also testified that he had worked in four or five different jobs over the last five years. When asked who would care for the baby if he were given custody, he stated that his mother, his girlfriend, his father, and his brother would help him care for her. However, he admitted that all of them have jobs and could not care for the child while he was at work. He then suggested that he

would hire a babysitter until he could afford a nanny. Finally, while he did not mention health insurance for the child, he did admit that he did not have health insurance. In stark contrast to the father in *In re Adoption of SCD*, at the time of the hearing, appellant had taken no significant steps to prepare for having the baby with him if he was awarded custody.

In conclusion, we hold that appellant has not "otherwise legitimated" the child pursuant to Ark. Code Ann. § 9-9-206(a)(2). Therefore, we affirm the circuit court's finding that his consent to the adoption is not required by Ark. Code Ann. § 9-9-206(a)(2).

## II. Due Process

Appellant's next point on appeal is that the trial court erred in finding that he had no right to notice of the adoption and a hearing in violation of his right to due process. He argues that the Arkansas statutory scheme of adoption violates his right to due process by denying him the opportunity to establish a significant relationship with his biological child.

Ark. Code Ann. § 9-9-212(a) (Repl. 2002) requires notice of the filing of a petition for adoption to be given "at least twenty (20) days before the date of the hearing" to those persons "whose consent to the adoption is required" but who have not consented. With regard to fathers, this includes those who were married to the mother at the time the minor was conceived or at any time thereafter, those who have adopted the minor, those who have custody of the minor at the time the petition is filed, or those who have otherwise legitimated the minor. *See* Ark. Code Ann. § 9-9-206(a)(2) (Repl. 2002). Ark. Code Ann. § 9-9-224 (Repl. 2002) also requires that notice be given to putative fathers who have registered with the putative-father registry, "[w]hen information concerning the child is contained in the putative father registry *at the time of the filing of the petition for adoption . . . .*"

In this case, the petition for adoption was filed on November 19, 2004, two weeks before the baby was born and almost a month before appellant knew that his encounter with Ms. Ford had resulted in a pregnancy and consequent birth. Thus, he had no relationship with the child entitling him to notice under Ark. Code Ann. § 9-9-206. Moreover, having no knowledge of Ms. Ford's pregnancy, he did not file with the putative-father registry before November 19, 2004, which was required in order for him

to be provided notice pursuant to Ark. Code Ann. § 9-9-224. Therefore, neither of these statutes governing notice required that appellant be given notice of this adoption hearing. However, his argument is not that the *statutes* required that he be given notice, but rather that his right to due process required that he be given notice, and therefore that the statutory scheme denying notice in this case is unconstitutional.

The United States Supreme Court has addressed what due-process protections are afforded an unwed, biological father in several cases, culminating with its decision in *Lehr v. Robertson*, 463 U.S. 248 (1983). In these cases, the Court has distinguished between unwed, biological fathers who have developed strong custodial and personal relationships with their children and those who have not. *See Lehr, supra; Quilloin v. Walcott*, 434 U.S. 246 (1978); *Caban v. Mohammed*, 441 U.S. 380 (1979); *Stanley v. Illinois*, 405 U.S. 645 (1972).

The biological father in *Lehr* filed a petition to vacate the order of adoption of his child, who had been adopted when she was over two years old by her mother and the mother's husband. The biological father lived with the mother before the child's birth and visited the mother in the hospital when the child was born, but never provided financial support and never offered to marry the mother. Because he was not a member of any class of possible fathers who were required by statute to be notified of the adoption and had not entered his name in New York's putative-father registry, which would have entitled him to notice of the adoption proceeding, he did not find out about the adoption until it was already pending when he filed a "visitation and paternity" petition. When he attempted to have the adoption proceedings stayed, he was informed that the adoption had already been granted. The Court held that until an unwed father demonstrates a "full commitment to the responsibilities of parenthood" by coming forward to participate in the rearing of his child, his interest in personal contact with his child does not acquire substantial protection under the Due Process Clause. *Id.* at 261. The Court explained further as follows:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he *grasps that opportunity and accepts some measure of responsibility for the child's future,* he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he

fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Id.* at 262 (emphasis added).

Noting that the father in *Lehr* had never established a "significant, personal, or financial relationship" with the child and, therefore, that it was not assessing the constitutionality of New York's procedures for terminating a *developed* relationship, the Court stated that its only concern was whether New York adequately protected the unwed father's opportunity to form a relationship with his child. *Id.* at 262-63. In other words, rather than recognizing an absolute liberty interest, the Court determined that an unwed father who shared a mere biological connection rather than a developed relationship with his child had an "opportunity" interest that he must promptly grasp in order to merit constitutional protection. *Id.* Because the unwed father in *Lehr* would have received notice had he merely mailed a postcard to the putative-father registry before the child's adoption over two years after her birth, the Court held that the New York statutes adequately protected the father's "inchoate interest in establishing a relationship" with his child. *Id.* at 265.

In the case before us, appellant did not have an established relationship with his infant child at the time the petition for adoption was filed. Therefore under *Lehr* and its predecessors, the only issue before us is whether his "opportunity to form . . . a relationship" with his child was "adequately protected." *Id.* at 263. Here, appellant received actual notice of the petition for adoption. On December 14, 2004, six days before the adoption hearing, appellant was served with a summons, petition for adoption, notice of hearing, and notice of deposition. To the extent that appellant had any due-process right that required protection — and under *Lehr*, he had merely an "opportunity interest" — his interest was adequately protected by his receipt of actual notice of the pending adoption in the form of a summons, petition for adoption, and notice of hearing. In another adoption case regarding the requirement that notice be given to satisfy due process, we stated:

> The requirements of due process of law under [*Armstrong*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62,] were that she have notice reasonably calculated to apprise her of the pendency of the action

and to afford her an opportunity to present her objections. These requirements of due process were met.

> We have heretofore recognized that *one who was apprised of the pendency of an action and aware of the nature of the relief sought before a judgment was rendered,* was not entitled to have the judgment vacated, whether process was served on him or not.

*Mayberry v. Flowers,* 347 Ark. 476, 484, 65 S.W.3d 418, 424 (2002) (quoting *Pender v. McKee,* 266 Ark. 18, 582 S.W.2d 929 (1979) (holding that mother was not deprived of due process in adoption hearing where she had actual notice of time, place, and nature of the hearing)); *see also Hulstine v. Morris,* 819 F.2d 861 (8th Cir. 1987) (holding that due-process requirements may be satisfied if a criminal defendant received actual notice of the charges against him, even if the indictment or information is deficient).

■ Appellant received notice of the pending adoption. He appeared at the hearing. The fact that he appeared without an attorney was his choice to make. We hold that appellant's opportunity interest was adequately protected in this case by his receipt of actual notice of the pending adoption. We therefore reject his argument that his due-process rights have been violated, and we affirm the judgment of the circuit court.

Affirmed.

BROWN and IMBER, JJ., concur.

HANNAH, C.J., dissents.

R OBERT L. BROWN, Justice, concurring. I, too, would affirm but write to emphasize a salient point. It occurs to me that Mr. Escobedo had some obligation to track Misty Ford's condition after he had unprotected sex with her if he ever planned to claim notice of an adoption and the paternity and custody of the resulting child. Here, Mr. Escobedo did nothing prior to birth, and the result was that the Nickitas filed for adoption two weeks before the child was born. That was in November 2004, and the adoptive parents have now had the child since birth.

Mr. Escobedo fiercely contends that once he found out he might be the father, due to the exclusion of Ms. Ford's boyfriend as the father, he took positive steps to legitimate the child including paternity testing and registering with the Arkansas Putative

Father Registry. But his paternity petition was filed a month after the adoption petition and a week after the adoption hearing. His registry with the putative-father registry was still later. Moreover, I agree with the majority's conclusion that Mr. Escobedo has taken no significant steps to prepare for the custody of the child.

I am persuaded by the reasoning of the Vermont Supreme Court which also considered the rights of a biological father to a child when that father was unaware of the pregnancy and had failed to act. *See In re C.L., Juvenile*, 878 A.2d 207 (Vt. 2005). In that case, the Vermont Supreme Court said:

> To conclude that petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability.

878 A.2d at 211.

Next, the Vermont Court quoted from an Arkansas case and said:

> Since *Lehr* [*v. Robinson*, 463 U.S. 248 (1983)], numerous courts have concluded that it is the father's burden to discover the existence of his child, even if he had no notice of the pregnancy or birth, or risk losing the opportunity to transform a biological link into a full and enduring parental relationship. *In re S.J.B.*, 294 Ark. 598, 745 S.W.2d 606, 607 (1988) (although father was unaware of his child, notice of adoption proceeding was not constitutionally required where "biological father was not interested enough in the outcome of the sexual encounter ... to even inquire concerning the possibility of her pregnancy")[.]

*Id.* at 211-12.

In the case at hand, Mr. Escobedo did not act until after the adoption hearing. There is much he could have done prior to that time, including checking on Ms. Ford's condition and registering with the putative-father registry. The actions he took were woefully late in my opinion. For these reasons, I would affirm.

IMBER, J., joins this concurring opinion.

Annabelle Clinton Imber, Justice, concurring. While I agree that the circuit court's decision in this case must be affirmed, I cannot agree with the reasoning presented by the majority opinion. I must therefore respectfully concur in the opinion.

In its analysis, the majority declines to address the issue of whether Mr. Escobedo was *entitled* to receive notice of the adoption hearing by simply noting that he received actual notice of the hearing. The majority cites our decisions in *Mayberry v. Flowers*, 347 Ark. 476, 65 S.W.3d 418 (2002), and *Pender v. McKee*, 266 Ark. 18, 582 S.W.2d 929 (1979), but those cases are inapposite here. In each of those cases, the parent in issue was unquestionably statutorily entitled to notice because his or her consent was required for the adoption. The father in *Mayberry* was married to the mother of the child at the time of the child's birth, and thus his consent was required under Ark. Code Ann. § 9-9-206(a)(2) (Repl. 2002), and the parent in *Pender* was the biological mother of the child, whose consent is required under Ark. Code Ann. § 9-9-206(a)(1).

Under Arkansas law, the question of whether a party is entitled to receive notice of an adoption hearing must necessarily begin with the question of whether such party is required to consent to the adoption. The statute governing the hearing on a petition for adoption requires:

> At least twenty (20) days before the date of the hearing, notice of the filing of the petition and of the time and place of hearing shall be given by the petitioner to (1) any agency or person whose consent to the adoption is required by this subchapter but who has not consented; and (2) a person whose consent is dispensed with upon any ground mentioned in § 9-9-207(a)(1), (2), (6), (8), and (9).

Ark. Code Ann. § 9-9-212(a) (Repl. 2002). Additionally, Ark. Code Ann. § 9-9-224(b) states, "When information concerning the child is contained in the putative father registry at the time of the filing of the petition for adoption, notice of the adoption proceedings shall be served on the registrant unless waived by the registrant in writing signed before a notary public." *Id.*; *see also* Ark. Code Ann. § 20-18-701 *et seq.* (Repl. 2005). Thus, the only people entitled to notice of an adoption hearing are those persons whose consent to the adoption is required, putative fathers who have registered with the registry, or

those persons whose consent is dispensed with upon any ground mentioned in section 9-9-207(a)(1), (2), (6), (8), and (9).[1]

Mr. Escobedo clearly does not fall into one of the above-listed categories in section 9-9-207(a). The only way he would be entitled to notice of the hearing would be if his consent were required pursuant to Ark. Code Ann. § 9-9-206 or if he had filed with the putative father registry under Ark. Code Ann. § 9-9-224. It is undisputed that Mr. Escobedo did not, prior to the hearing, file with the putative father registry or otherwise legitimate the child according to Arkansas law. Moreover, even the majority agrees "that the statutes did not require that notice be provided to appellant at the time the petition in this case was filed."

In fact, the appellees' proposition — that because Mr. Escobedo was not entitled to notice of the hearing his consent was not required — holds true. While in *In re SCD*, 358 Ark. 51, 186 S.W.3d 225 (2004), we declined to adopt a rule that the filing of the petition for adoption constitutes the cutoff date for purposes of determining the father's right to consent to adoption, such a

---

[1] These subsections provide that consent to adoption is not required of:

(1) A parent who has deserted a child without affording means of identification or who has abandoned a child;

(2) A parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree;

. . . .

(6) A parent judicially declared incompetent or mentally defective if the court dispenses with the parent's consent;

. . . .

(8) Any legal guardian or lawful custodian of the individual to be adopted, other than a parent, who has failed to respond in writing to a request or consent for a period of sixty (60) days or who, after examination of his written reasons for withholding consent is found by the court to be withholding his consent unreasonably; or

(9) The spouse of the individual to be adopted, if the failure of the spouse to consent to the adoption is excused by the court by reason of prolonged unexplained absence, unavailability, incapacity, or circumstances constituting an unreasonable withholding of consent.

Ark. Code Ann. § 9-9-207(a)(1), (2), (6), (8), (9) (Repl. 2002).

brightline rule must necessarily exist in relation to the hearing itself.[2] According to Arkansas law, all parties whose consent to adoption is required are entitled to notice. Ark. Code Ann. § 9-9-212(a)(1). In addition, some parties whose consent is not required are nonetheless entitled to notice. Ark. Code Ann. § 9-9-212(a)(2). Finally, notice of the adoption proceeding must be served on any person registered with the putative father registry. Ark. Code Ann. § 9-9-224(b). The statutory scheme does not, however, contemplate a separate category of persons who are not entitled to notice but whose consent is nonetheless required.

The rationale for the statutory provisions governing adoption could not be more obvious: the purpose of the hearing on the adoption petition is to determine whether the petition should be granted. Such a determination necessarily involves consideration of whether all the necessary parties have consented to the adoption. Thus, the issue of whether a party qualifies as a person required to consent to the adoption pursuant to Ark. Code Ann. § 9-9-206 must be determined prior to the hearing. In other words, the class of persons required to consent to the adoption is closed by the time of the hearing on the adoption petition. If the party is not a member of that class *before* the hearing, no actions on his or her part after the hearing can then make him or her part of the class. It is for this reason that the decision in *In re SCD, supra,* is distinguishable from the case at hand.

In *In re SCD*, the putative father had filed with the putative father registry and was consequently entitled to notice of the adoption proceedings. Moreover, the actions of the father in submitting to a paternity test and seeking custody of the child were all completed *before* the hearing on the adoption petition. The issue in that case was whether such actions, completed after the filing of the adoption petition but before the hearing on the petition, could be considered in determining whether the father had "otherwise

---

[2] The legislature has subsequently made it clear that the relevant date is the date of the filing of the petition for adoption. Act 437 of 2005, codified at Ark. Code Ann. § 9-9-207(10), (11), provides that the putative father's consent to adoption is not required where the putative father has failed to establish a significant custodial, personal, or financial relationship with the juvenile prior to the time the petition for adoption is filed. Ark. Code Ann. § 9-9-207(10), (11) (Supp. 2005). Additionally, Ark. Code Ann. § 20-18-702(c) now provides that the putative father registry "may accept the information prior to the birth of the child or at any time prior to the filing of the petition for adoption." Ark. Code Ann. § 20-18-702(c) (Repl. 2005).

legitimated" the child. *In re SCD*, 358 Ark. 51, 186 S.W.3d 225 (2004). We held that the actions were properly considered. *Id.* In this case, Mr. Escobedo had not filed with the putative father registry and had not "otherwise legitimated" the child before the hearing on the petition, and thus was not entitled to notice of the petition. Moreover, the above analysis demonstrates that, *in any case* where the putative father's consent is required for adoption at the time of the hearing, such father is also entitled to notice of the hearing, but in any case where the putative father's consent is *not* required at the time of the hearing, no subsequent actions on the part of the putative father will resurrect a consent requirement.

The harshness of the result that there is nothing a putative father can do to "otherwise legitimate" a child after the hearing on the adoption petition where the putative father has not filed with the registry before the filing of the adoption petition must be balanced with the state's interest in finality and the need for prompt action in adoption proceedings. The New York Court of Appeals stated:

> To conclude that petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability.

*Robert O. v. Russell K.*, 80 N.Y.2d 254, 266, 604 N.E.2d 99 (1992). Similarly, the Supreme Court of Vermont has summarized the rationale expressed by most courts and commentators:

> Relying on *Lehr's* observation that strict compliance with the requirements of the New York putative father registry promoted the state's interest in ensuring 'promptness and finality' to the process of finding the child a permanent and stable placement, 463 U.S. at 266, 103 S.Ct. 2985, most courts and commentators have concluded that the 'opportunity interest' must be grasped promptly both before and after the child's birth, or it will be lost.

*In re C.L.*, 878 A.2d 207, 211 (Vt. 2005)(citing *Adoption of Kelsey S.*, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (1992); *In re Raquel Marie X.*, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418 (1990); *In re Baby Boy K.*, 1996 SD 33, 546 N.W.2d 86 (1996); E. Buchanan,

*The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 Ohio St. L.J. 313 (1984). Numerous courts have also concluded that "it is the father's burden to discover the existence of his child, even if he had no notice of the pregnancy or birth, or risk losing the opportunity to transform a biological link into a full and enduring parental relationship." *In re C.L.*, 878 A.2d 207, 211 (citing *In re S.J.B.*, 294 Ark. 598, 745 S.W.2d 606 (1988); *In re Zacharia D.*, 6 Cal.4th 435, 24 Cal.Rptr.2d 751, 862 P.2d 751 (1993); *In re Tinya W.*, 328 Ill.App.3d 405, 262 Ill.Dec.606, 765 N.E.2d 1214 (2002); *In re Baby Doe*, 734 N.E.2d 281 (Ind. Ct. App. 2000)).

The most significant point, as expressed by the Supreme Court in *Lehr v. Robertson*, 463 U.S. 248 (1983), is that all that is required for the putative father to be entitled to notice is for him to file with the putative father registry. *Lehr v. Robertson*, 463 U.S. 248, 264 (1983) ("the right to receive notice [is] completely within [the putative father's] control"); *see also* Ark. Code Ann. § 20-18-701 *et seq*. Such registries have repeatedly been upheld as sufficient protection for the constitutional rights of putative fathers. *See, e.g., Lehr v. Robertson, supra; State ex rel S.H.*, 119 P.3d 309 (Utah 2005); *In re C.L.*, 878 A.2d 207 (Vt. 2005); *Matter of Baby Boy K*, 546 N.W.2d 86 (S.D. 1996). Utah first upheld its registry as constitutional in *Wells v. Children's Aid Society of Utah*, 681 P.2d 199 (1984) and has reaffirmed this holding in numerous cases. *See, e.g., State ex rel S.H., supra; Sanchez v. L.D.S. Social Services*, 680 P.2d 753 (1984).

Much like the Arkansas statute concerning .the putative father registry, the Utah statute does not provide notice to putative fathers who fail to register with the registry. U.C.A., 1953, § 78-30-4(3). Indeed, the Utah statute specifically provides:

> Any father of such child who fails to file and register his notice of claim to paternity and his agreement to support the child shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child. Such failure shall further constitute an abandonment of said child and a waiver and surrender of any right to notice of or to a hearing in any judicial proceeding for the adoption of said child, and the consent of such father to the adoption of such child shall not be required.

U.C.A., 1953, § 78-30-4(3). Despite the harsh consequences of failure to register, the Utah courts have repeatedly held the statute to be sufficient protection for a putative father's

constitutional rights. In *Sanchez v. L.D.S. Social Services*, 680 P.2d 753 (Utah 1984), for example, the Utah supreme court held that the statute barred a putative father from obtaining custody of a child born out of wedlock where the father failed to file with the registry until the day after the child was relinquished to social services. Despite the fact that Sanchez, the putative father, filed with the registry only four days after the child was born, the court nonetheless held, "It is of no constitutional importance that Sanchez came close to complying with the statute. Because of the nature of subject matter dealt with by the statute, a firm cutoff date is reasonable, if not essential." *Id.* at 755.

Likewise, the Oklahoma Supreme Court has upheld its registry and notice statutes, which are substantially similar to our statutes. The Oklahoma statute provides that certain persons are entitled to notice of a hearing to terminate parental rights including:

1. any person adjudicated by a court in this state to be the father of the child;

2. any person who is recorded on the child's birth certificate as the child's father;

3. any person who is openly living with the child and the child's mother at the time the proceeding is initiated or at the time the child was placed in the care of an authorized agency, and who is holding himself out to be the child's father;

4. any person who has been identified as the child's father by the mother in a sworn statement;

5. any person who was married to the child's mother within ten (10) months prior or subsequent to the birth of the child; and

6. any person who had filed with the paternity registry an instrument acknowledging paternity of the child, pursuant to Section 6 of this Act.

Title 10 O.S.1991 § 29.1(B). The Oklahoma appellate court, in *Matter of C.J.S.*, 903 P.2d 304 (Okla. 1995), held that a putative father's constitutional rights were not violated when he did not receive notice of a hearing to terminate his parental rights where he

did not meet any of the statutory terms, including filing with the registry. As in this case, the trial court had nonetheless provided notice, but the Oklahoma court stated:

> We hold that notice to Tariah [the putative father] was not required, either under our statutes or by the Due Process Clause of the Federal Constitution. In an abundance of caution, the trial court authorized publication notice in order to insure the validity of the adoption of these children. We need not address the sufficiency of the unnecessary publication notice.

*Id.* at 309. So, too, in the instant case, Mr. Escobedo was not entitled to notice under our statutes or the Due Process Clause of the Federal Constitution, and consequently, any notice he received was unnecessary and need not be addressed.

Moreover, the fact that Mr. Escobedo was unaware of the child's existence in this case is immaterial. We have held, along with numerous other courts, that the putative father's lack of knowledge is not sufficient grounds upon which to exempt him from the statutory requirements. *In re S.J.B.*, 294 Ark. 598, 745 S.W.2d 606 (1988) (reversed on other grounds) ("the biological father was not interested enough in the outcome of his sexual encounter . . . to even inquire concerning the possibility of her pregnancy"); *see also In re Baby Boy K*, 546 N.W.2d 86 (S.D. 1996) ("when a putative father is ignorant of his parenthood due to his own fleeting relationship with the mother and her unwillingness to later notify him of her pregnancy, the child should not be made to suffer"); *In re Paternity of Baby Doe*, 734 N.E.2d 281 (Ind. Ct. App. 2000) ("courts from sister states considering cases similar to this one have placed the responsibility for promptly asserting parental rights on the putative father, even when the mother of the child has attempted to prevent the father's knowledge of or contact with the child"); *Robert O. v. Russell K.*, 604 N.E.2d 99 (N.Y. 1992) ("to conclude that petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness"). In the instant case, the Arkansas putative father registry sufficiently protected Mr. Escobedo's due process rights in connection with the adoption proceeding. Because he chose not to avail himself of those procedures and did not "otherwise legitimate" the child before the date of the adoption hearing, I would affirm the circuit court's decision.

BROWN, J., joins.

JIM HANNAH, Chief Justice, dissenting. I respectfully dissent. The majority characterizes the issue in this case as whether Rusty Wayne Escobedo's "opportunity interest" in forming a relationship with his infant daughter was "adequately protected." This court concludes that Escobedo's opportunity interest was adequately protected by his receipt of notice four business days before an adoption hearing regarding a child he did not know existed. I believe that Escobedo was denied the opportunity to legitimate his daughter in contravention of his right as a putative father under the United States Constitution. Also, common law principles concerning the natural rights of parents were ignored. I also believe that a hearing on whether Escabdeo had to consent to adoption was improperly turned into a hearing on his fitness as a parent.

The facts are that in March 2004, Ford and Escobedo had unprotected sexual intercourse. A daughter was conceived and born December 3, 2004. According to Escobedo's testimony, he and Ford had been seeing each other for three or four months when they had sexual intercourse, and they had known each other since the seventh grade.[1] He also testified that Ford knew at all times that she could reach him through his parents but had not attempted to do so. Escobedo only learned that Ford had been pregnant and had given birth to a baby on December 14, 2004, when he was served with a summons and petition for an adoption hearing on December 20, 2004. It was only at the December 20, 2004, hearing that the results from paternity testing were presented and Escobedo knew for certain that he was the father.[2] At this time, he was also served with a notice of deposition and other pleadings.

Pursuant to the notice of deposition, on December 16, 2004, Escobedo appeared at the law offices of counsel representing the adoptive parents for his deposition even though counsel for the Nickitas failed to comply with notice requirements of Ark. R. Civ. P. 27. He submitted to the deposition, and submitted to paternity testing. Escobedo has never denied his paternity. He retained counsel and timely responded to the petition for adoption and filed a petition to establish paternity. He filed with the putative father registry within fourteen days of learning that Ford had delivered a

---

[1] The circuit court concludes that the child was born of a "one-night-stand." The evidence does not support this conclusion, and how the child was conceived was not relevant.

[2] On December 2, 2004, Billy Ray Gibbons filed with the putative father registry listing Misty Ford as the mother.

child he had fathered. According to his testimony, he stood ready to take custody of his daughter, and his mother had agreed to quit work and care for his daughter.

Previously, on November 19, 2004, Mark and Jennifer Nickita filed a petition for adoption seeking to adopt Ford and Escobedo's daughter, affirming under verification that the father was unknown. At the hearing, on December 20, 2004, Ford acknowledged Escobedo as the father. It appears that at the very least there was less than adequate investigation undertaken before filing the petition.

On the day that Ford and Escobedo's daughter was born, Ford signed a consent to adoption form and a form agreeing to the delivery of the child to the Nickitas. On that same date, an order was entered allowing the Nickitas to take custody of the child. They did so. This was eleven days before Escobedo knew of the child.

It should be noted that Escobedo received only six days notice of the adoption hearing set for Monday, December 20, 2004, two of which were Saturday and Sunday. The trial court's order granting adoption is unclear and states:

> The Court finds, based on the credible evidence before it, that the conception of Baby Nickita occurred as the result of an encounter, commonly referred to as a "one night stand," involving unprotected 'sex. After that chance union, the Respondent made no effort to determine whether a pregnancy resulted from this brief encounter. The Court finds that he had the means and ability to have taken such action if he had wished to do so. The Court concludes, based on the credible evidence before it, that Mr. Escobedo failed to timely file with the Putative Father Registry. He further failed to timely take meaningful action to otherwise legitimate Baby Nickita. While there may be no explicit time period for such action, it should come, at a minimum, before the date set for final hearing on the adoption.

From the order, it appears that the circuit court concluded that Escobedo failed to establish a constitutionally protected relationship with his daughter by not determining Ford was pregnant and failing to file with the putative father registry before his child's birth or before the hearing. Escobedo is also faulted for his failure to "otherwise legitimate" the child, whatever that means.

The United States Supreme Court has made it clear that under the federal constitution,[3] "[t]he fact of biological parentage generally offers a person only 'an opportunity . . . to develop a relationship with his offspring.' " *Hodgson v. Minnesota*, 497 U.S. 417, 445 (1990) (quoting *Lehr v. Robertson*, 462 U.S. 248, 262 (1983)). The State has an obligation to adequately protect an unwed father's "inchoate interest in assuming a responsible role in the future of his child." *Lehr*, 462 U.S. at 248. "Parental rights based on the biological relationship are inchoate; it is the assumption of the parental responsibilities which is of constitutional significance." *In re Adoption of John Doe*, 543 So.2d 741, 748 (Fla. 1989). The unwed father is under an obligation to "grasp the opportunity." *Id.* An unwed father must "quickly grasp his opportunity interest." *In re Adoption of J.D.C.*, 751 N.E.2d 747, 751 (Ind. Ct. App. 2001). The reason this is required is obvious. A child's need for permanence and stability cannot be postponed.

The facts of the present case depart widely from the facts in the cases handed down by the United States Supreme Court concerning preservation of an opportunity interest. They did not concern an unwed father who learned of the birth of the child four business days before the hearing on adoption. Pursuant to *Lehr, supra,* due-process rights do not attach until the unwed father acts. Aside from the question of whether Escobedo's opportunity interest in developing a relationship with his child was adequately protected, this court is also faced with the issue of whether Escobedo had any opportunity to develop a relationship with his daughter. This court in *In re S.C.D.*, 358 Ark. 51, 186 S.W.3d 225 (2004), stated that there is no temporal requirement that an unwed father commence or complete legitimization of his child by some certain date or event such as filing of the adoption petition. The decision of the majority in the present case cannot be reconciled with *S.C.D, supra.* unless the majority is holding that by failing to

---

[3] Under the common law in Arkansas, the mother enjoyed the greatest rights over an illegitimate child, her rights being "superior to that of anyone else." *Waldron v. Childers*, 104 Ark. 206, 210, 148 S.W. 1030, 1031 (1906). However, "as between strangers," the father of an illegitimate child was preferred under the common law in Arkansas. The father of an illegitimate child has "rights superior to that of a stranger in custody disputes over the child" *Roque v. Frederick*, 272 Ark. 392, 396, 614 S.W.2d 667, 669 (1981) (*citing Lipsey v. Battle*, 80 Ark. 287, 97 S.W. 49 (1906). Consistently in *Lee v. Grubbs*, 269 Ark. 205, 599 S.W.2d 715 (1980), the court again indicated that the father of the illegitimate child enjoys preference over strangers unless he is unfit.

register with the putative father registry before the hearing on the adoption, and by failing to respond to the petition for adoption before the hearing, and before a response was due, Escobedo failed to avail himself of an opportunity to develop a relationship with his daughter. Neither the rules of civil procedure nor due process condone serving a person with a summons and requiring defense on the case referenced in the summons within four business days of service, without the presence of retained counsel, and before a response to the summons is even due.

Escobedo filed with the putative father registry soon after the hearing and also filed a petition to establish paternity. In *S.C.D.*, T.F., the father, filed both before the hearing on adoption. However, T.F. was aware of the pregnancy and that he was the father. In reality, while the facts of *S.C.D.* and the present case are strikingly similar, the decision reached by this court in *S.C.D.* and the present case could not be more dissimilar. In S.C.D., T.F., prevailed in asserting a right to object to adoption, and in the present case, the father lost in his attempt to assert a right to object to adoption. T.F. in *S.C.D.* never denied paternity. Escobedo never denied paternity. T.F. filed a response to the petition adoption. Escobedo filed a response within two weeks and well within the statutorily allowed time. T.F. "embraced" paternity by filing a petition himself. *S.C.D.*, 358 Ark. at 56. Escobedo filed a petition as well. T.F. filed a petition as soon as he learned the baby had been born and there was a petition for adoption. Escobedo did likewise. At the adoption hearing, T.F. stated at the hearing that he wanted the child, that he wanted to be involved, and that his mother would assist in caring for the child. Escobedo testified that he would take care of her that, "I would do anything in the world to provide for her." His mother offered to resign her job to care for the child.

Yet in the present case the majority affirms a finding by the circuit court that Escobedo failed to establish a relationship with this child sufficient to give him a right to have a say in the adoption of his daughter while under basically the same facts in *S.C.D.* the court held that, "Clearly, TF has 'legitimated' this child, not only by signing the Putative Father Registry, but also by petitioning for a determination of paternity, and by taking significant steps to prepare for having the baby with him if he is awarded custody." *S.C.D.*, 358 Ark. at 58-59. Escobedo did both these things as well. What more could Escobedo do under the circumstances of this

case? Clearly, Escobedo legitimized his daughter, too, at least to the extent required in S.C.D, if not more given the few days he had before the hearing.

However, there are admittedly some distinctions between the facts of the present case and *S.C.D.* that should be noted. In *S.C.D.*, T.F. was pursuing college and preparing for life in a way the father in the present case is not. Escobedo is not pursing college, but instead works at low wage jobs in manufacturing. I also note that Escobedo's testimony in the hearing covers 23 pages. In the course of those 23 pages, approximately five pages include questions relevant to Escobedo's relationship to his child. The vast majority of the questions were directed to Escobedo's fitness as a parent, a matter that was not at issue in this hearing. However, facts were elicited to show that the Nickitas would make better parents than Escobedo. This court once said that:

> [D]ue regard must be given to natural desires. We said in *Verser v. Ford*, 37 Ark. 27, "It is one of the cardinal principles of nature and of law that, as against strangers, the father — however humble and poor — if able to support the child in his own style of life, and [if the father be] of good moral character, cannot, without the most shocking injustice, be deprived of the privilege, . . . however brilliant [the advantages offered] may be."

*Hazelip v. Taylor*, 209 Ark. 510, 512-13, 190 S.W.2d 982, 983 (1945).

I have a further concern. At the December 20, 2004, hearing, Escobedo informed the court that he had counsel but that his attorney could not be there that day. The hearing went forward because, according to the court, Escobedo had notice of it. The court then informed Escobedo that the petitioners, the Nickitas, had to prove by clear and convincing evidence that they were entitled to adoption, or in other words, that Esdcabedo's consent was not required. The circuit court should have continued the matter until Escobedo's counsel could have been present.

At the hearing, counsel for the Nickitas raised the issue of Escobedo's fitness as a parent. This is an issue that is relevant to termination of his parental rights. Escobedo found himself in an adversarial proceeding where his morals and integrity were being challenged in an attempt to convince the court he should not be given custody when what was at issue was whether his opportunity to develop a relationship with his daughter had been adequately protected and whether he had failed to avail himself of an oppor-

tunity to develop a relationship with his daughter. If the circuit court considered the evidence offered by the Nickitas to show Escobedo was not a fit parent, then arguably termination of parental rights were at issue, and if so, Escobedo was entitled to counsel. *Briscoe v. State*, 323 Ark. 4, 912 S.W.2d 425 (1996). He was without counsel even though he had retained counsel. The circuit court was aware Escobedo had retained counsel and should have continued the hearing until Escobedo's counsel could be present. Finally, in regard to the hearing, I also note that contrary to statute and the constitution, there was no showing by clear and convincing evidence that Escobedo's consent was not necessary.

In *In re: Adoption of Lybrand*, 329 Ark. 163, 169, 946 S.W.2d 946, 949-50 (1997), this court stated:

> Adoption statutes are strictly construed, and a person who wishes to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. *In Re Adoption of K.F.H. and K.F.H.*, 311 Ark. 416, 844 S.W.2d 343 (1993); *Harper v. Caskin*, 265 Ark. 558, 561, 580 S.W.2d 176, 179 (1979) (stating adoption petitioner's burden is "heavy").

I do not in any way discount the great concern that the circuit court and this court have for the best interests of the child. "The State's interest in providing for the well-being of illegitimate children is an important one." *Caban v. Mohammed*, 441 U.S. 380, 391 (1979). However, constitutional law should be followed. In this case the constitutional protections afforded Escobedo have been ignored.

I also must note that at the hearing, counsel for the Nickitas relied heavily upon Arkansas Code Annotated Section 9-9-206 (Repl. 2002). This code section is constitutionally suspect in failing to adequately protect putative fathers as required under *Lehr, supra*. Under *Lehr*, a putative father's attempt to establish a substantial relationship with his child determines the constitutional protection afforded the relationship. If the facts of this case were similar to the facts in *Lehr*, we would be examining whether Escobedo failed to take advantage of the opportunity to develop a relationship with his child. However, in this case, the question is whether there is anything he could have done but did not do to establish such a relationship in the few days before the hearing. *Lehr* does not stand for the proposition that where a putative father is given four business days notice, and has done all that can be accomplished in those four days, he has failed to establish a

relationship giving him a right to object to adoption. The statute does not adequately protect Escobedo's inchoate right to an opportunity to develop a relationship with his daughter as required under *Lehr*.

I do not believe that filing with the putative father registry upon having unprotected sexual intercourse is required as a condition precedent[4] under *Lehr* or the other opinions of this court. Escobedo did what was reasonably possible in the time he had. *Lex non intendit aliquid impossible* is a familiar maxim of the law. *Heong v. United States*, 112 U.S. 536 (1884). The law does not intend that impossible requirements be met. This opinion is inconsistent with the principles set out in *Lehr*, inconsistent with this court's holding in *S.C.D.* and the decision of the circuit court should be reversed as regrettable as that may be. Such a decision would serve the best interest of the children who will be adopted in the future.

---

[4] The purpose of the putative father registry is to entitle putative fathers to notice of legal proceedings pertaining to the child for whom the putative father has registered. Ark. Code Ann. § 20-18-702(a)(2) (Repl. 2005).